**WILMINGTON TRUST CO., Executor of the Estate of W. Sam Carpenter, III, and Murton Dupont Carpenter**

v.

**The UNITED STATES.**

**C. Porter and Phyllis Dupont SCHUTT**

v.

**The UNITED STATES.**

**Neva S. McMULLAN, Executrix of the Estate of Harry McMullan, Jr., and Neva S. McMullan, Individually**

v.

**The UNITED STATES.**

**Nos. 50–73, 51–73 and 130–76.**

United States Court of Claims.

·Nov. 14, 1979.

Don V. Harris, Jr., Washington, D. C., attorney of record, for plaintiffs, Wilmington Trust Co. Carolyn T. Seely, Covington & Burling, Washington, D. C., Thomas P. Sweeney, and Richards, Layton & Finger, Wilmington, Del., of counsel.

David C. Hickman, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant, Schutt. Theodore D. Peyser, Washington, D. C., of counsel.

Lee E. Knott, Jr., Washington, N. C., attorney of record, for plaintiff, McMullan. McMullan & Knott, Washington, N. C., of counsel.

Mary M. Abate, U.S. Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant, United States. Theodore D. Peyser, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, DAVIS, NICHOLS, KASHIWA, KUNZIG, BENNETT and SMITH, Judges, en banc.

### OPINION

FRIEDMAN, Chief Judge:

These three consolidated federal income tax refund suits present two separate issues: (1) whether certain expenses the taxpayers incurred in connection with their timber operations, the gain on which is capital gain, were ordinary business expenses and hence deductible from taxpayers' ordinary income (as taxpayers contend), or were part of the cost of selling the timber and therefore deductible only from the capital gains (as the government argues); (2) whether, under the doctrine of equitable recoupment, the government could offset against refunds due to the taxpayers for overpayment of income taxes the reduction in estate taxes that the taxpayers previously had made to reflect the estate's prior payment of the refunded income taxes, in a situation where the statute of limitations would bar the direct assessment of such additional taxes against the estate. We answer both questions in favor of the taxpayers.[1]

---

1. We adopt the findings of the trial judges in both cases. The findings are not printed, however, since the pertinent portions are set forth in this opinion.

## I.

### A. *Wilmington Trust* and *Schutt* (Nos. 50–73 and 51–73).[2]

1. During the taxable years involved, 1964–70, the taxpayers, W. Sam Carpenter, III and C. Porter Schutt, were partners in Wilmon Timberlands ("Wilmon").[3] The firm owned and managed from 35,700 to 45,000 acres of timberland in Alabama, which it held for investment purposes. Findings 20, 21. Except in 1970, when it conducted its own logging operations, Wilmon entered into contracts for cutting and removal of timber on and from its land. Findings 21, 22.

During the years involved, Wilmon had between nine and 11 full-time employees. The partnership had a manager, a forester, an office manager, forest workers, and two employees who maintained roads and bridges. In 1970 the partnership employed seven or eight additional men in connection with its own logging operations. Finding 23.

The manager operated the timberlands so as to obtain continuous growth through natural stand regeneration. This requires that the timber cut in any year not exceed the annual growth. Wilmon makes regular studies of the growth and volume of the timber, and on that basis selects the areas most suitable for cutting, which range from 500 to 2,000 acres. The cutting is done at a rate which, on the average, enables the entire tract to be cut in a 10-year cycle. Finding 24.

When the area for cutting is selected, an effort is made to maintain the best stock for future growth, cutting, and natural re-seeding. Trees are designated for cutting on the basis of whether their growth has been or is likely to be slowed and whether their removal will aid the growth of younger trees of good stock. Trees that are cut include those that have reached maturity, that have been damaged, that are defective, and that overshadow and dominate less mature trees and retard their growth by depriving them of sun, air, and nutrients. Finding 24.

In effectuating natural stand regeneration, Wilmon's timber crews perform various tasks. They make timber growth studies and insect damage surveys, and control insect infestations by cutting infected trees. They repaint all boundary lines every 5 years to prevent encroachments. They trap and attempt to control beaver, which otherwise build dams which back up water and kill trees. They practice fire control and extinguish fires. They maintain roads and bridges. They mark trees for cutting where growth is slowing, to provide spacing necessary to enhance recent growth and to obtain revenue. Finding 25.

In cutting and selling timber, Wilmon first designated the trees to be cut. The partnership manager negotiates all cutting contracts by showing the available timber to three or four prospective buyers and agreeing upon a price; negotiation of a contract takes approximately 30 minutes. During several of the years involved, Wilmon operated under a single long-term contract with a sawmill company, so that little additional negotiation was required. Finding 26(a), (b).

A typical cutting period lasts 3 or 4 months a year. During that time Wilmon undertakes "contract supervision," which includes weekly or biweekly field checks to ascertain that all merchantable logs were removed, that minimum damage was done to the remaining trees, and that only marked trees are cut. This requires "from a half-day every week or two weeks." Finding 26(c). Wilmon's forester testified that the contract supervision was "not done to assist the cutter" but was "done for our benefit."

2. The facts related to the equitable recoupment issue in both cases are set forth in our discussion of that issue in part III, *infra*.

3. The wives of these two persons are parties only because they filed joint returns with their husbands. We use the term "taxpayers" to refer only to the husbands. During this litigation Mr. Carpenter died, and the Wilmington Trust Company as executor was substituted as a plaintiff.

After the contract logger has cut and removed the timber to the sawmill, the timber is "scaled" there to determine the amount of the selling price. Wilmon employed a part-time scaler during the cutting season, who did the scaling on all timber other than plywood, which was scaled by the plywood buyer's employees. Finding 26(d). At oral argument the plaintiffs, in effect, conceded that their expenses for their scaler were sales expenses of the timber sales and deductible as capital rather than as ordinary expense, but stated that the amount involved is *de minimis*. Except for the scaler, Wilmon has not hired anyone specifically in connection with the sale of timber or any additional employees for that purpose. Finding 27.

All of Wilmon's sales "conformed to the practice of good forestry and silviculture." Finding 28.

2. In their income tax returns the plaintiffs reported all of their land and wood management expenses as deductions from ordinary income. The Commissioner ruled that a portion of those expenses was sales expense that could be offset only against the capital gain on the sale of timber and not against ordinary income, and assessed deficiencies.

Trial Judge Miller held that the expenditures taxpayers made in connection with their timber operations were capital and not ordinary expenses.

B. *McMullan* (No. 130–76).

1. During the years involved, 1969–71, the taxpayers, Mr. McMullan and his wife,[4] owned half and leased the other half of land in West Virginia and North Carolina. Land was held for investment purposes. The land's primary source of income was timber sales, although it also generated income from oil, gas, and coal. Findings 7, 8, 9.

Mr. McMullan sought to manage the timber on the "perpetual yield theory, cutting no more than annual growth in order to enhance the value of the property as a long-term productive asset, and in the course of management on that basis timber was sold." He did no scientific research to determine the average annual growth in board feet, however, but merely made a rough estimate of such quantity based on a working knowledge of the land. Finding 10. The timber was managed so as to improve the stand, rather than merely to maintain the status quo, "by marking the timber to be sold, and by requiring the timber cutters to girdle certain undesirable trees marked by the forester in order to kill such cull trees that were hindering other growth in the vicinity." Finding 11. Marking of trees was unnecessary to sell timber but was necessary for "sale and cull in order to be assured of improving the quality and quantity of the stand of timber on the leased lands." Finding 12.

During the years involved, McMullan entered into at least 16 contracts for the cutting and sale of timber on the property. Finding 18. Timber was sold on a yearly basis, and from October 1970 through 1971 timber was cut at all times. Two contractors maintained sawmills on the property. Finding 19.

McMullan incurred various expenses in connection with the "management and operation" of the land. The major item was "forestry" expenses, which represented salaries of the foresters, who marked the trees that were the subject of the timber sales contracts; one of them also checked performance under those agreements. Findings 14, 15, 16, 17. Other expenses included those for frequent trips McMullan made from his home to the property, on some of which he negotiated timber cutting contracts and timber sales (finding 21); amounts spent for repainting boundary lines and marking timber (finding 24); and for legal fees (findings 22, 23). Although "part" of the expenses "were directly related to the sale or disposition of timber," the record "does not show sufficient detail to indicate what portions of the total manage-

---

4. Harry McMullan died in 1973, and Mrs. McMullan, with whom he filed joint returns for the years involved, appears here both as his executrix and individually.

ment expenses were so related." Finding 26.

2. In their federal income tax returns for the years involved, the taxpayers reported the income from the land as capital gain, and all expenses incurred in the management and operation of the land were deducted from ordinary income. The Commissioner disallowed some of those deductions, asserting that the portion of the expenses attributable to the timber operations was to be offset against the capital gain on the timber sales rather than treated as a deduction from ordinary income.

Trial Judge Browne upheld the taxpayers' position. He ruled that they properly had offset all the expenses incurred in connection with the timber operations against the ordinary income on the sale of the timber.

## II.

A. In section 631(b) of the Internal Revenue Code of 1954, Congress provided that gain upon the disposal by the owner of timber that was held for more than 6 months, under a contract by which the owner retained an economic interest in the timber, is to be treated as capital gain. The provision was designed to give an owner of timber who sells it under cutting contracts the same favorable capital gain treatment as an owner who sells the timber outright. See S.Rep.No.627, 78th Cong., 1st Sess. 25–26 (1943), dealing with section 117(k) of the 1939 Code, the predecessor of section 631.

Generally, "costs incurred in the . . . disposition of a capital asset are to be treated as capital expenditures," which are not deductible as business expenses but are "added to the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain (or increasing the loss) when the asset is sold." *Woodward v. Commissioner,* 397 U.S. 572, 574–75, 90 S.Ct. 1302, 1303, 1304, 25 L.Ed.2d 577 (1970). In sec-

tion 631(b) Congress provided that the gain on the sale of timber under the cutting contracts there covered "shall be considered as though it were a gain . . . on the sale of such timber." The question is whether, in providing that such gain be treated as capital, Congress also intended to treat the expenses incurred in connection with the timber operations as capital.

In *Union Bag-Camp Paper Corp. v. United States,* 325 F.2d 730, 163 Ct.Cl. 525 (1963), the full court (then consisting of five judges) considered the question and, adopting the opinion of the trial commissioner, unanimously held that the expenses were ordinary deductible business expenses. The facts of that case are strikingly similar to those here. Union Bag entered into contracts for the cutting and selling of timber on lands it leased. It treated all of its expenses in connection with its timber operations as ordinary business expenses and deducted them from ordinary income. The Commissioner disallowed 5 percent of Union Bag's "total general expenses for land management on the ground that such five percent of management expense was properly attributable to the cost of entering into and supervising certain cutting contracts . . . and should be charged against the gain realized by plaintiff from such contracts." *Id.* at 734–35, 163 Ct.Cl. at 534. In rejecting the Commissioner's action, the court stated in *id.* at 741–42, 163 Ct.Cl. at 545 (footnote added):

> The record shows that during 1949 plaintiff's employees did spend a small part of their time negotiating sales prices for cutting contracts, designating areas to be cut, marking certain trees to be left standing, making casual checks as to quantities of timber cut, and occasionally inspecting the areas involved after cutting had been completed. (Finding 26, *infra.*) The record further shows, however, that the foregoing activities were only incidental to overall forest management activities,[5] and that, even the com-

---

5. The court found that "[i]n the development and regeneration of its timberlands . . . plaintiff . . . relied largely on (a) natural

reseeding, and (b) the so-called 'seed tree method,' by which in any cutting or thinning of any particular tract of land, selected trees (chosen

plete elimination of the contract activities would have affected total management expenses merely in nominal amounts. Nonetheless, defendant contends that under *Towanda Textiles, Inc. v. United States,* 180 F.Supp. 373, 149 Ct.Cl. 123 (1960) and Rev.Rul. 58–266, 1958–1 C.B. 520, some portion of the management expense must have been selling expense directly attributable to the entering into and supervising of the cutting contracts and therefore should be offset from the gain realized under those contracts rather than deducted from ordinary income. In support of its estimate that such selling expense amounted to five percent of the total cutting contract receipts, defendant merely asserts that the Commissioner's determination in this regard must be accepted absent proof to the contrary by the taxpayer. However, as stated above, the record before this court is persuasive that the contract activities of plaintiff's employees were only incidental to their forest management duties and at best had but nominal effect on plaintiff's payroll and other management expenses. In no sense do the expenses at issue here resemble the direct and substantial expenses involved in *Towanda Textiles, Inc.,* . . . .

The court then went on to state that, even accepting *arguendo* the Commissioner's estimate that 5 percent of the management expenses were properly attributable to the cutting contracts, *"in any event* . . selling expenses, such as those involved here, are properly deductible from gross income and are not required to be restricted to an offset against contract proceeds." *Id.* at 742, 163 Ct.Cl. at 546. It concluded that the Code provisions "contain nothing which on any normal reading would prohibit the deduction by a timber dealer from income of his ordinary and necessary expenses incurred in the growing or selling of his timber, or which would require him to offset such expenses against capital gains realized on timber sales or disposals." *Id.* at 743, 163 Ct.Cl. at 547.

The government contends that this second branch of the *Union Bag* decision, which it labels *dictum,* was incorrect and should be overruled. We find it unnecessary to reach that question, however, since we conclude that the first branch of *Union Bag,* which the government explicitly stated it is not asking us to overrule, controls these cases.

Here, as in *Union Bag,* "the contract activities of plaintiff's employees were only incidental to their forest management duties and at best had but nominal effect on plaintiff's payroll and other management expenses" and were not "direct and substantial." In the cases before us, as shown above, the taxpayers conducted their timber operations primarily to maintain and improve the timber. Most of the work their employees did would have been necessary to accomplish those objectives without regard to selling the timber. Although the timber sales generated substantial income, they, too, were an integral and essential part of maintaining and improving the quality and number of the trees.

There are relatively minor variations between the operations in *Union Bag* and those in *Wilmington Trust* and *McMullan,* and between those in the latter two cases. But the basic operations in the three cases were the same. Whatever minor differences may exist do not justify different treatment of the cases before us and *Union Bag.*

In *Wilmington Trust,* the parties stipulated that "[i]n the event that the plaintiffs are incorrect in their basic contention that all land management and woods management expenses are ordinary deductions and not 'direct selling expenses,' the proper amounts to be treated as 'direct selling expenses' are as follows: . . . ." The stipulation then specified dollar amounts for each of the years 1964 to 1970, which ranged from 12.9 percent to 28.7 percent of the total expenses. On the basis of these stipulated percentages, Trial Judge Miller distinguished *Union Bag.* He stated:

on the basis of quality, height and crown size) are left standing to provide natural reseeding in

the surrounding area." Finding 13, 325 F.2d 730, 163 Ct.Cl. at 558–59.

The expenses at issue here were from 12.9 to 28.7 percent of the management expenses in the various years from 1964 through 1970. They were derived from a specific allocation of the portion of each activity or expenditure deemed directly related to the sales. Thus, they were recognizable and hardly nominal.

The plaintiffs object to this use of the stipulation on the ground that by its terms "its use is permitted *only in the event that* plaintiffs' contention is found to be incorrect, not to *prove* that contention incorrect." Plaintiffs' objection is well taken. The stipulation provided only that if the plaintiffs' contention that all the expenses were deductible from ordinary income were rejected, then a specified percentage of those expenses would be treated as the cost of selling the timber. In view of plaintiffs' contention that their case is indistinguishable from and is controlled by *Union Bag*, the percentage of expenses they stipulated could be treated as direct selling expenses if their argument on *Union Bag* were rejected cannot be relied upon to show that the percentage of expenses attributable to the selling of the timber was sufficiently higher in this case than in *Union Bag* to make the latter inapplicable. In other words, we decide the applicability of the first ground of decision in *Union Bag* without regard to the stipulation.

B. In *McMullan,* but not in *Wilmington Trust,* the government argues that, with one exception, section 631(b) does not cover the contracts under which the plaintiffs disposed of their timber. This argument is based on the requirement in section 631(b) that the disposals of timber take place under a contract "by virtue of which [the] owner retains an economic interest in [the] timber." A retained economic interest exists when a taxpayer acquires an interest in standing timber by investment and looks to "income derived from the . . . severance of the timber . . . for a return

of his capital." Treas.Reg. § 1.611–1(b)(1). The income generated by the cutting contracts must be totally contingent upon the actual severance of the timber for section 631(b) to apply. *See, e. g., Superior Pine Products Co. v. United States,* 201 Ct.Cl. 455, *cert. denied,* 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973); *Boeing v. United States,* 98 F.Supp. 581, 121 Ct.Cl. 9 (1951); *Dyal v. United States,* 342 F.2d 248 (5th Cir. 1965); *Estate of Lawton v. Commissioner,* 33 T.C. 47 (1959).

The government states that in the timber contracts it has seen (covering approximately 40 percent of the receipts at issue), the payments were to be made prior to cutting and were based on the timber marked as available to be cut and not on the amount actually cut. Such an arrangement would not satisfy the requirement in section 631(b) of a retained economic interest. *Cf. Union Bag, supra,* 325 F.2d at 740, 163 Ct.Cl. at 543 ("it is clear that plaintiff retained the required 'economic interest' since the payments under the cutting contracts were based upon actual units of timber cut and were payable only as timber was cut").

Trial Judge Browne made no findings on whether these contracts provided for a retained economic interest, and the plaintiffs do not appear to have offered proof that the contracts did so.

Although recognizing that the income from the dispositions of timber under these contracts was properly reported as capital gain even if section 631(b) does not cover the contracts [6] the defendant contends that, if the section does not apply, forest management expenses related to these dispositions were capital expenditures and not deductible from ordinary income. We find it unnecessary to decide whether section 631(b) covers these contracts. Even if it does not, the gain on the sale of the McMullan timber was capital under section 1221 of the Code (*see* note 6 *supra* ). We have

---

6. This result is dictated by the trial judge's finding that the plaintiffs' lands "were held for investment purposes" and that "the primary source of income from the property was timber." Finding 9. In such a situation, the gen-eral rule that income from an investment is capital gain applies. *See Scott v. United States,* 305 F.2d 460, 158 Ct.Cl. 434 (1962); *Boeing, supra.*

determined that the forest management expenses related to the sale of the timber comprised only a nominal and incidental portion of the total forest management expenses and that under *Union Bag* all of the latter expenses for that reason are deductible as ordinary rather than as capital expenses. This is so whether the receipts under the cutting contracts were capital gains because of section 631(b) or because of section 1221 of the Code.

Accepting *arguendo* the defendant's view of the nature of these timber dispositions, there is no reasonable basis for distinguishing, for federal tax purposes, the forest management expenses in *Wilmington Trust* and *Union Bag* from those in *McMullan*. In both cases before us, the plaintiffs held the land for investment purposes, deriving their income from sales of timber. In both, the land was managed according to modern perpetual yield theories, to improve or at least maintain the timber stand. In both, only a nominal portion of the expenses was attributable to the selling of the timber. The only significant distinction between the operating methods in these two cases is the different basis of payment for the timber. This difference has no relationship to the proper tax treatment of the timber management expenses.

The policy considerations noted in *Union Bag* that favor deduction of these expenses from income, such as encouragement of "desirable conservation practices" and minimization of extraordinary accounting burdens (325 F.2d at 744 & n. 28, 163 Ct.Cl. at 549 & n. 28), are no less applicable in *McMullan* than in *Wilmington Trust* and *Union Bag*, despite the different methods of payment. In each case the cutting and selling of timber, whether or not the seller had a retained economic interest, had as a major purpose the culling of some trees to encourage growth of the rest. There is no reason to give the *McMullan* plaintiffs less favorable tax treatment from that given the virtually identical operations in *Union Bag* and in *Wilmington Trust*, just because the income was capital gain by virtue of section 1221 rather than section 631(b).

## III.

■ The equitable recoupment issue arises in both cases because the IRS assessed income tax deficiencies, now the subject of these refund suits, against the taxpayers after their deaths, which taxes the executors deducted from the decedents' gross estates. The effect of the income tax refunds is to reduce the deductions for those taxes the estates took, and therefore to increase the estate taxes. The statute of limitations bars the government from collecting these additional estate taxes. The question is whether the government can avoid the statute by recouping the additional estate taxes out of the plaintiffs' income tax recoveries. The issue concerns only the plaintiffs Wilmington Trust Company and Neva S. McMullan (in her capacity as executrix of the estate of Harry McMullan, Jr.).

A. 1. *Wilmington Trust* (No. 50–73). On November 30, 1973, while this suit was pending, the plaintiff, W. Sam Carpenter, III, died. His executor, the Wilmington Trust Company, was substituted for him. Finding 31.

Prior to his death, but after the filing of this suit, the IRS initiated further investigations into his income tax returns. Finding 30. This investigation led to the issuance on November 19, 1974, of a 90-day letter asserting additional income tax deficiencies against him for the years 1967, 1969, and 1970. His executor paid these deficiencies and the accrued interest, and thereafter filed claims for refunds of the 1969 and 1970 deficiencies and interest. In December 1975, this suit was amended to reflect these additional claims. Finding 32.

Carpenter's estate tax return had been filed on or before August 30, 1974, and the tax had been paid. Finding 32. In May 1975, the executor sought a refund of part of the estate tax reflecting the deduction from the gross estate of the income tax deficiencies and interest assessed for 1969 and 1970. Finding 34. The refund was allowed in the estate tax audit report dated February 3, 1977. Finding 35.

2. *Neva S. McMullan, Executrix* (No. 130–76). In July 1973, the IRS assessed the income tax deficiencies challenged in this suit against the McMullans. Harry McMullan, Jr., had died on March 7, 1973. The deficiencies were paid in August and September 1973. Finding 27. The estate tax return was filed on December 10, 1973, and took deductions from the gross estate for the deficiencies and interest paid. Upon audit, the IRS allowed these deductions. Finding 29. The present suit, seeking refund of the additional income taxes for which deficiencies were assessed, was filed on March 22, 1976.

3. The government concedes in both cases that by the time it sought to offset the estate tax deficiencies resulting from income tax refunds, the statute of limitations precluded direct assessment of those deficiencies [7] it contends, however, that the doctrine of equitable recoupment permits these offsets. In each case the trial judge permitted recoupment.[8]

B. The Supreme Court three times has considered the doctrine of equitable recoupment in tax cases. It has allowed recoupment twice and denied it once. The three decisions together explain the doctrine and its parameters.

The first case was *Bull v. United States*, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). Under the partnership agreement of the decedent's firm, his estate received the equivalent of the decedent's share of the partnership income for the year following his death. The Commissioner initially treated this amount as part of the estate and subject to the estate tax. He subsequently assessed an income tax deficiency against the estate, which the estate paid.

The executor filed suit in this court, seeking alternatively (1) refund of the income tax on the ground that the partnership's payment to the estate was corpus and not income, or (2) if the amount were income, a credit by the government for the overpayment of the estate tax resulting from the treatment of the payment as part of the estate. By that time the statute of limitations barred any direct claim by the executor for refund of the estate tax he had paid. This court denied the offset as barred by limitations, after first holding that the payment was income to the estate.

The Supreme Court reversed the denial of the offset. It ruled that because the government "through a palpable mistake" collected a larger estate tax "than it was entitled to," its "[r]etention of the money was against morality and conscience." *Id.* at 260, 55 S.Ct. at 700. It held that when the government "brought a new proceeding [to collect the income tax] arising out of the same transaction involved in the earlier proceeding [the payment by the partnership to the estate]," the money belonging to the estate that the government "unjust[ly] re[tained] . . . may be used by way of recoupment and credit in an action by the United States arising out of the same transaction." *Id.* at 261, 55 S.Ct. at 700. It stated (*id.* at 262, 55 S.Ct. at 700, footnote omitted) that "recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded" and that "[s]uch a defense is never barred by the statute of limitations so long as the main action itself is timely."

In the second case, *Stone v. White*, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265 (1937), the Court permitted the government to invoke equitable recoupment to assert as an offset an otherwise time-barred claim. There the trustees of a testamentary trust had paid a tax on trust income, which treatment then was correct. Subsequently, the Supreme Court held that in those circum-

---

7. In both suits the claim for offset initially was made in amended answers filed in *Wilmington Trust* on December 16, 1977 (the limitations period had expired August 30, 1977), and in *McMullan* on January 4, 1978 (the limitations period had expired December 10, 1976).

8. Because of prior partial settlements in each case that ensured at least some refund of the relevant income tax deficiencies to the plaintiffs in both cases, the issue of recoupment arises independently of the resolution of the timber operations expense issue in both *Wilmington Trust* and *McMullan*.

stances the beneficiary rather than the trust was liable for the tax. By that time, however, the statute of limitations barred the government from collecting the tax from the beneficiary.

In a suit by the trustees to recover the tax they improperly had paid, the Supreme Court held that the government could off-set the tax that the beneficiary should have paid. Noting that any recovery by the trustee would be for the benefit of the beneficiary, the Court pointed out (*id.* at 535, 57 S.Ct. at 853) that "but a single tax was due upon the particular income as-sessed and that petitioners' demand arises from the circumstance that the tax was paid from the income by the trustees when it should have been paid by the benefi-ciary." The Court stated (*id.* at 537, 57 S.Ct. at 854) that "[e]quitable conceptions of justice compel the conclusion that the retention of the tax money would not result in any unjust enrichment of the govern-ment."

In the third case, *Rothensies v. Electric Storage Battery Co.,* 329 U.S. 296, 67 S.Ct. 271, 91 L.Ed. 296 (1946), however, the Court denied equitable recoupment. In so doing, it significantly limited what appeared to be the broad implications of the language in *Bull* and *Stone.*

In *Rothensies* the taxpayer, between 1919 and 1926, had paid excise taxes on sales that it and the government believed were subject to tax. In 1926 the company changed its mind and sued for a refund of the taxes it had paid between 1922 and 1926, claiming that the tax was not payable on those sales. At that time the statute of limitations had already run on the taxes paid for the earlier years. In 1935, pursu-ant to a judgment in its favor, the taxpayer received a refund of the taxes it had paid for 1922 to 1926.

The Commissioner treated the refund as income to the taxpayer in 1935 and assessed additional income and excess profits taxes for that year. In a suit by the taxpayer for the refund of those additional taxes, the taxpayer contended that if the refund were income, it should be permitted to apply against the additional tax the barred excise taxes it had erroneously paid between 1919 and 1922. The lower court permitted re-coupment.

The Supreme Court reversed. It stated (*id.* at 299, 67 S.Ct. at 272) that recoupment

has never been thought to allow one transaction to be offset against another, but only to permit a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects, and judg-ment to be rendered that does justice in view of the one transaction as a whole.

It added that "recoupment in tax litigation" is given only "limited scope." *Id.* It point-ed out (*id.* at 299–300, 67 S.Ct. at 272) that in both *Bull* and *Stone* "a single transaction constituted the taxable event claimed upon and the one considered in recoupment," and that "the single transaction or taxable event had been subjected to two taxes on inconsistent legal theories, and what was mistakenly paid was recouped against what was correctly due." The Court rejected the view of the Court of Appeals that the re-coupment doctrine applied in *Bull* and *Stone* "was 'based on concepts of fairness' " and that there was

no reason for narrowly construing the requirement that both claims originate in the same transaction. We think this mi-sapprehends the limitations on the doc-trine of recoupment as applied to tax law and it leads us to state more fully reasons for declining to expand the doctrine be-yond the facts of the cited cases.

*Id.* at 300–01, 67 S.Ct. at 273.

The Court explained that statutes of limi-tations also rest upon concepts of fairness, since they protect litigants against stale claims they may have difficulty in meeting. The Court stated (*id.* at 302, 67 S.Ct. at 273–274, footnote omitted):

As statutes of limitation are applied in the field of taxation, the taxpayer some-times gets advantages and at other times the Government gets them. Both hard-ships to the taxpayers and losses to the revenues may be pointed out. They tempt the equity-minded judge to seek for ways of relief in individual cases.

But if we should approve a doctrine of recoupment of the breadth here applied we would seriously undermine the statute of limitations in tax matters. In many, if not most, cases of asserted deficiency the items which occasion it relate to past years closed by statute, at least as closely as does the item involved here. *Cf. Hall v. United States*, 43 F.Supp. 130, 95 Ct.Cl. 539. The same is true of items which form the basis of refund claims. Every assessment of deficiency and each claim for refund would invite a search of the taxpayer's entire tax history for items to recoup.

Following *Rothensies* this court and other courts have considered the application of equitable recoupment in tax cases in a variety of situations. The cases have gone both ways, as the courts dealt with varying facts.[9] In all of them, however, the inquiry was whether the tax for which recoupment was sought arose out of the same transaction as that involved in the main action. Since the determination of that issue necessarily turns largely upon the individual facts, it would not be useful to compare the facts in the cases now before us with those in the other cases in an attempt to determine which of those other cases most closely resemble the present ones. The important thing in evaluating the facts in this case is to bear in mind this court's statement that "the teaching of *Rothensies* is that it [equitable recoupment] is not a flexible doctrine, but a doctrine strictly limited, and limited for good reason." *Ford v. United States*, 276 F.2d 17, 23, 149 Ct.Cl. 558, 569 (1960). In that case it therefore declined to permit equitable recoupment despite its recognition that "[i]f the doctrine of recoupment were a flexible one, susceptible of expansion, it might well be applied in the instant case." *Id.*

C. Under the "limited scope" of "recoupment in tax litigation" (*Rothensies, supra*), the government is not entitled to recoup the time-barred estate tax deficiencies from the income tax refunds due the plaintiffs. The two claims do not arise out of the same transaction.[10]

---

9. Recoupment denied: *Kramer v. United States*, 406 F.2d 1363, 186 Ct.Cl. 684 (1969) (government sought recoupment of taxes owed by one beneficiary of a multibeneficiary estate); *Ford v. United States*, 276 F.2d 17, 149 Ct.Cl. 558 (1960) (assets valued twice, once for estate tax purposes and once for income tax purposes at the time of subsequent sale, resulting in higher estate tax assessment under first valuation and higher income tax assessment under second valuation); *Minskoff v. United States*, 490 F.2d 1283 (2d Cir. 1974), aff'g 349 F.Supp. 1146 (S.D.N.Y.1972) (estate tax paid on estate including cash representing full sale price of recently disposed asset; capital gains tax deficiency for that sale subsequently assessed against the estate); *Missouri Public Service Co. v. United States*, 245 F.Supp. 954 (W.D.Mo. 1965), aff'd 370 F.2d 971 (8th Cir. 1967) (adjustments to correct repeated IRS mistreatments of depreciation of assets increased one year's taxes and decreased another's); *Kojes v. United States*, 241 F.Supp. 762 (E.D.N.Y.1965) (essentially the same facts as in *Minskoff, supra*).

Recoupment allowed: *National Biscuit Co. v. United States*, 156 F.Supp. 916, 140 Ct.Cl. 443 (1957) (incorrect excess profits credit led to overpayment of some taxes and underpayment of others); *E. I. DuPont DeNemours & Co. v. United States*, 147 F.Supp. 486, 137 Ct.Cl. 191 (1957) (incorrect treatment of rescission of excess profits tax deferral led to unnecessary payment of interest on one tax deficiency and nonpayment of interest on another deficiency); *Pond's Extract Co. v. United States*, 134 F.Supp. 476, 133 Ct.Cl. 43 (1955) (incorrect treatment of payment of income tax settlement decreased subsequent excess profits taxes and increased a subsequent income tax); *Boyle v. United States*, 355 F.2d 233 (3d Cir. 1965) (estate tax paid on arrearage of cumulative preferred stock dividends extant at decedent's death; income tax assessed on subsequent payments against the arrearage); *United States v. Bowcut*, 287 F.2d 654 (9th Cir. 1961) (underpayment of income taxes by decedent taxpayer led to overpayment of estate taxes); *United States v. Herring*, 240 F.2d 225 (4th Cir. 1957) (same as *Bowcut, supra*; government did not assert deficiency claim against the estate until after the estate tax limitations period expired).

This court also had allowed recoupment in *Dunigan v. United States*, 23 F.Supp. 467, 87 Ct.Cl. 404 (1938). That decision, however, antedates the Supreme Court's decision in *Rothensies*, and did not reflect the narrower scope of equitable recoupment the Court there applied.

10. In view of our holding on this issue, we find it unnecessary to reach Wilmington Trust's contention that the government is barred from recoupment because it failed to preserve its rights when the estate tax liability was determined.

The income tax refund is based upon the deductibility from ordinary income of the timber operations expenses. The estate tax deficiency, however, exists because the estate deducted the additional income taxes reflecting those expenses that it paid and now is recovering. The recoupment claim thus arises from a different transaction (the reduced deduction from the estate tax) than the refund claims (the increased deductions from ordinary income). The government is not seeking to offset against each other two taxes levied on the same transaction, but to offset the tax on one transaction against the tax on another. This it cannot do.

The only sense in which these two claims could be said to arise out of a single transaction is that the determination that the timber expenses were deductible from ordinary income had an effect upon both the estate tax and the income tax. The fact that a single tax determination may affect the taxes on two transactions does not convert the two transactions into a single one. If such interdependency of separate claims is sufficient to make them arise out of the same transaction, the doctrine of equitable recoupment would be significantly extended beyond the "limited scope" the Supreme Court accorded it in *Rothensies.*

As the decided cases show, there is no litmus paper test for determining whether two tax claims arose out of the same transaction. Some cases clearly are within that category, and some cases clearly are without it. There is a large group of cases, however, somewhere in between. Where a case is within this middle range, so that the answer is more difficult to determine—and the present cases are of that type—it is important to consider the policy considerations the equitable recoupment doctrine is designed to implement.

As the Supreme Court explained in *Rothensies,* the fairness concept upon which the doctrine rests is not limited to preventing the retention of money that a litigant in good conscience should not retain. The statute of limitations itself rests upon concepts of fairness, and an expansive application of equitable recoupment "would seri-

ously undermine the statute of limitations in tax matters." *Rothensies, supra,* 329 U.S. at 302, 67 S.Ct. at 273. These two conflicting policies must be reconciled to achieve a proper balance in the particular case, having due regard for the fact that "[a]s statutes of limitation are applied [to deal with] taxation, the taxpayer sometimes gets advantages and at other times the government gets advantages." *Id.*

Although the courts have not specifically articulated the point, one factor that may affect the determination whether to permit the avoidance of the statute of limitations is whether the litigant seeking a recoupment of a time-barred claim had a fair opportunity to bring suit to recover the tax before the statute ran. Equitable recoupment is an equity doctrine, and fairness to the parties is an important consideration in the application of equitable principles.

To whatever extent this factor may be relevant, it militates against recoupment here. In *Wilmington Trust* the estate taxes, which reflected the deduction from ordinary income of the timber expenses, were paid no later than August 30, 1974. The statute of limitations on any further claims by the government for additional estate taxes ran on August 30, 1977. In December 1975, the suit in this court was amended to include a claim reflecting the deductibility of those expenses from ordinary income, and in May 1975 the executor filed a claim for a refund of other portions of the estate tax. The government thus was on notice that the plaintiffs were challenging the income taxes the estate had paid more than a year before the statute of limitations ran on any additional estate taxes that would have resulted from a refund of the income tax.

In *McMullan* the estate tax return was filed on December 10, 1973, and the estate took deductions for the additional taxes and interest that had been paid earlier that year resulting from the Internal Revenue Service's treatment of the timber expenses as capital. The statute of limitations upon any claim by the government for additional estate taxes ran on December 10, 1976. A claim for refund of the income taxes was

filed with the IRS in July 1974, and the present suit was filed, following the disallowance of the initial refund claim, on March 22, 1976. The government had more than 2 years after the assertion of the claim to a refund, and more than 8 months after the filing of this suit, within which to assert the claim it now seeks to recoup.

In sum, there is no unfairness to the government in denying it equitable recoupment in these two cases.

## CONCLUSION

The plaintiffs are entitled to deduct from ordinary income the expenses of their timber operations. The government is not entitled to offset against the income tax refunds due the plaintiffs the reduction in estate taxes the plaintiffs previously paid that would reflect the estates' prior payment of the refunded income taxes. The cases are remanded to the Trial Division to determine the amount of recovery pursuant to Rule 131(c).