Neva S. McMULLAN, Executrix of the Estate of Harry McMullan, Jr., and Neva S. McMullan, Individually

v.

The UNITED STATES.

No. 153–79T.

United States Court of Claims.

Aug. 11, 1982.

Lee E. Knott, Jr., Washington, N. C., attorney of record, for plaintiffs. McMullan & Knott, Washington, N. C., of counsel.

Mary M. Abate, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D. C., for defendant. Gilbert W. Rubloff, Robert S. Watkins and Bruce W. Reynolds, Washington, D. C., of counsel.

Before DAVIS, BENNETT and SMITH, Judges.

ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

SMITH, Judge:

This income tax case presents three issues, two of which we considered in *Wilmington Trust Co. v. United States*[1] (*Wilmington*), and one that we have not previously addressed. In *Wilmington,* we held that the present plaintiffs were entitled to report certain timber sales as capital gains, either under 26 U.S.C. § 631(b)[2] or under 26 U.S.C. § 1221,[3] and that plaintiffs could deduct the related expenses against ordinary income. We also held that the Government was not entitled to offset plaintiffs' income tax recovery by the resulting decrease in estate tax deductions under the doctrine of equitable recoupment. The current case, however, also presents the additional third issue, whether plaintiffs' prepayment of interest improperly distorted their 1972 taxable income.[4]

Plaintiffs argue that the doctrine of collateral estoppel resolves the issues decided in *Wilmington* in their favor. Plaintiffs also argue that their prepayment of interest did not distort their income but, instead, only compensated for the unusually large capital gain they realized in the tax year in question, 1972.

Defendant argues that, while the facts surrounding the sale of plaintiffs' timber are virtually identical to those in *Wilmington,* a change in plaintiffs' activities in relation to their timberlands takes this case out of the realm of collateral estoppel. Defendant also argues that plaintiffs' prepayment of interest distorted their taxable income and, therefore, the interest deduction must be allocated to the tax periods in which the expense accrued. Finally, defendant claims that, by virtue of an agreement it entered into with the representative of Harry McMullan, Jr.'s estate whereby the representative agreed to an adjustment of the estate tax liability to the extent of the recovery of any 1972 income tax which generated an estate tax deduction, the Government is entitled to offset any judgment for plaintiffs. Defendant claims that it relied to its detriment on the agreement and is, on the basis of equitable estoppel, entitled to reduce any judgment plaintiff receives by the resulting estate tax adjustment.

We discuss, first, application of the doctrine of collateral estoppel to federal in-

---

1. *Wilmington Trust Co. v. United States*, 221 Ct.Cl. 686, 610 F.2d 703 (1979) (*McMullan v. United States*, companion case) (en banc).

2. Section 631(b) of 26 U.S.C. (1976) states, in part:
   "(b) Disposal of timber with a retained economic interest
   "In the case of the disposal of timber held for more than 9 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties

shall be determined without regard to the provisions of this subsection. The date of disposal of such timber shall be deemed to be the date such timber is cut, but if payment is made to the owner under the contract before such timber is cut the owner may elect to treat the date of such payment as the date of disposal of such timber. * * *"

3. Section 1221 of 26 U.S.C. (1976) provides:
   "§ 1221. Capital asset defined
   "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—[section lists a number of exceptions, none of which are applicable to plaintiffs] * * *."

4. *See* Rev.Rul. 68–643, 1968–2 C.B. 76.

come tax cases, and, upon examination of the facts and law in this case, we hold that defendant is collaterally estopped from challenging plaintiffs' treatment of their timber sales and related expenses (Part I). We next consider the application of Rev. Rul. 68–643 to the facts in this case and hold that plaintiffs' prepayment of interest distorted their 1972 taxable income and, therefore, the deduction must be allocated over the periods in which it accrued (Part II). Finally, we address defendant's argument that it is entitled to offset any income tax recovery plaintiffs receive by all estate tax adjustments which result from that recovery. We hold that in the circumstances of this case plaintiffs are equitably estopped from claiming defendant is not entitled to the offset [5] (Part III).

## I.

■ In *Wilmington*, we found that plaintiffs' timberlands in West Virginia and North Carolina, of which they own half and lease half, were held for investment purposes. Furthermore, we found that plaintiffs' expenses included frequent trips by Harry McMullan, Jr., to the property. We held in that case that plaintiffs properly reported their timber sales as capital gains and deducted their expenses against ordinary income in their 1969–71 tax returns. Plaintiffs argue that the holding in *Wilmington* collaterally estops defendant from claiming that plaintiffs' timber income and expenses should be treated differently in 1972.

The related doctrines of res judicata and collateral estoppel embody the concept that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction * * * cannot be dis-

puted in a subsequent suit between the same parties or their privies." [6] Res judicata applies to repetitious suits involving the same cause of action. It binds the parties and their privies "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." [7] However, collateral estoppel is more limited in the scope of issues affected; less limited in the scope of bar applied. Collateral estoppel is appropriate when, upon a different cause of action between identical parties, a party attempts in the later case to contest an issue which was actually contested between the parties in a prior action and "upon the determination of which the finding or verdict was rendered." [8]

■ Since each tax year creates a new tax liability and a separate cause of action, we are concerned here with the application of collateral estoppel to the facts in this case, not res judicata. Collateral estoppel operates to free the Government and the taxpayer from "redundant litigation of the identical question of the statute's application to the taxpayer's status." [9] However, the doctrine should be carefully applied in order to assure that it does not work to "create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers." [10]

■ The applicability of collateral estoppel in this case depends upon three factors. First, are the issues in the present action the same as those resolved against the United States in *Wilmington?* Second, have the facts and legal principles which led to the holding in *Wilmington* changed in any significant manner? And third, are any spe-

---

5. All facts necessary to the opinion are contained within the discussion of the legal issues to which they relate.

6. *Southern Pac. R. R. v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27–28, 42 L.Ed. 355 (1897).

7. *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1877).

8. *Id.* at 353. *See also Red Lake Band v. United States*, 229 Ct.Cl. ——, 667 F.2d 73 (1981) (discussion of distinction between doctrines of res judicata and collateral estoppel).

9. *Tait v. Western Md. Ry.*, 289 U.S. 620, 624, 53 S.Ct. 706, 707, 77 L.Ed. 1405 (1933).

10. *Commissioner v. Sunnen*, 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948).

cial circumstances present in this case which justify the nonapplication of the doctrine?[11] We examine each of these factors in turn.

The issues raised by defendant here are the same as those which were "actually and necessarily determined" in *Wilmington.*[12] In *Wilmington,* the court upheld plaintiffs' claims that their timber property was maintained for investment purposes and, therefore, income from that property was entitled to capital gain treatment. Furthermore, the court directly addressed the issue whether plaintiffs' forest management expenses were deductible against ordinary income and there also held for plaintiffs. It is clear that the first condition for the application of collateral estoppel has been met.

As to the second factor, defendant argues that plaintiffs' activities in relation to their timberlands changed significantly in 1972 and, therefore, defendant should not be collaterally estopped from challenging plaintiffs' treatment of their timber sales and related expenses. Defendant claims that this change in plaintiffs' relationship with the property is evidenced in several ways. First, Harry McMullan, Jr. (hereinafter the taxpayer), traveled extensively in 1972 to the property in order to confer with his agents and to negotiate timber sales. However, the amount of taxpayer's expenses which defendant points to for travel in 1972, $3,230.17, is well within the range of those expenses taken in the tax years involved in *Wilmington.*[13] Second, defendant argues that the lease agreement between the taxpayer and its lessor indicates that the arrangement was a joint venture since it required the taxpayer to pay the lessor a certain percentage of the land's net profits. This claim also fails to show a substantial change in the surrounding facts since the agreement in question was in effect from January 1, 1965, long before the *Wilmington* tax years. Third, the taxpayer referred to the property in question as a "business" in his will. The term "business," standing alone, is a colloquialism for any activity entered into in order to produce income; the use of it, in and of itself, offers little weight to defendant's claim. Finally, defendant points to plaintiffs' inclusion of the property as a basis for entitlement to the payment of estate taxes in installments as allowed by section 6166 of the code.[14] In order to come under the provisions of section 6166, a significant portion of the value of the taxpayer's estate must be related to the taxpayer's closely held businesses. Again, the weight which might be attached to plaintiffs' 1973 request for a section 6166 payment deferral is no different in 1972 than it was in the *Wilmington* tax years.

We conclude that defendant has not made an adequate showing that the facts in the present case differ significantly from those in *Wilmington.* We do not see any evidence of special circumstances in the

---

11. *Montana v. United States,* 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979).

12. *Id.* at 153.

13. *Wilmington* concerned the tax years 1969, 1970, and 1971. As the table below shows, plaintiffs' expenses for their timberlands in 1972 were in the ballpark of their expenses for the two previous years.

| Expense | 1970 | 1971 | 1972 |
|---|---|---|---|
| Rent (Land) | $56,152.08 | $35,809.18 | $40,000.00 |
| Taxes—Real Estate | 5,978.67 | 6,502.11 | 6,250.94 |
| Taxes—Other | 803.18 | 756.79 | 960.68 |
| Insurance | 346.00 | 1,240.55 | 2,686.50 |
| Forestry | 27,129.99 | 20,854.00 | 18,797.05 |
| Legal & Audit | 2,708.14 | 5,660.40 | 2,275.00 |
| Telephone | 560.35 | 900.69 | 1,297.16 |
| Travel | 2,314.77 | 2,534.62 | 3,230.17 |
| Cassity Office | 6,172.18 | 1,301.54 | 4,986.51 |
| Office | 479.85 | | |
| Survey | 259.05 | | |
| Vehicle Expense | | 1,744.24 | 7,002.09 |
| Miscellaneous | 2,236.00 | 1,062.52 | 11,510.83 |
| Totals | 105,140.26 | 78,366.64 | 98,996.93 |

14. 26 U.S.C. § 6166 (1976) states, in part:

"(a) 5-year deferral; 10-year installment payment

"(1) In general

"If the value of an interest in a closely held business which is included in determining the gross estate of a decedent who was (at the date of his death) a citizen or resident of the United States exceeds 65 percent of the adjusted gross estate, the executor may elect to pay part or all of the tax imposed by section 2001 in 2 or more (but not exceeding 10) equal installments."

present case which would justify our not applying the doctrine and, since defendant does not argue that there was a change in statutory or case law, we hold that defendant is collaterally estopped from challenging plaintiffs' tax treatment of their timber sales and related expenses.

## II.

Revenue Ruling 68–643 states the Internal Revenue's position on the deductibility of interest prepaid by cash-basis taxpayers, who by properly timing the payment of deductions can influence the amount of their taxable income for a particular year. The ruling states, in pertinent part: [15]

Section 163 of the Internal Revenue Code of 1954 provides, in general, that there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

Section 446(a) of the Code provides that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. Section 446(b) of the Code provides, in part, that if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

\*    \*    \*    \*    \*    \*

In view of certain abuses which have arisen with respect to prepayment of interest by taxpayers using the cash receipts and disbursements method of accounting, the Service has reexamined its position in I.T. 3740. The Service now concludes that the deduction of prepaid interest in the year of payment by a taxpayer employing the cash receipts and disbursements method of accounting may not result in a clear reflection of income for the taxable year of payment. A deduction for interest paid in advance on each indebtedness for a period not in excess of 12 months of the taxable year immediately following the taxable year in which the prepayment is made will be considered on a case by case basis to determine whether a material distortion of income has resulted. Some of the factors to be considered in determining whether the deduction of prepaid interest gives rise to a material distortion of income include but are not limited to the amount of income in the taxable year of payment, the income of previous taxable years, the amount of prepaid interest, the time of payment, the reason for prepayment, and the existence of a varying rate of interest over the term of the loan. If interest is prepaid for a period extending more than 12 months beyond the end of the current taxable year, the deduction of such prepaid interest in the taxable year of payment will be considered as materially distorting income. Where a material distortion of income has been found to result from the deduction of prepaid interest, the Service will require the taxpayer to change his method of accounting with respect to such prepaid interest in order to allocate it over the taxable years involved.

Plaintiffs do not challenge the validity of the revenue ruling and we begin our analysis with the presumption that it is a valid statement of Internal Revenue policy.[16]

---

15. Rev.Rul. 68–643, *supra* note 4. The ruling accurately paraphrases the code sections which are relevant to an inquiry concerning distortions of taxable income and to the Secretary's powers to correct such distortions.

16. Revenue rulings are only Internal Revenue Service pronouncements of official interpretation of the tax law; they do not have the force and effect of Treasury Department Regulations. *See United States v. Hall*, 398 F.2d 383 (8th Cir. 1968). Rev.Rul. 68–643 has been reviewed by four federal courts of appeals and has been followed by all four. *Cole v. Commissioner*, 586 F.2d 747 (9th Cir. 1978), *cert. denied*, 441 U.S. 924, 99 S.Ct. 2034, 60 L.Ed.2d 398 (1979); *Anderson v. Commissioner*, 568 F.2d 386 (5th Cir. 1978); *Resnik v. Commissioner*, 555 F.2d 634 (7th Cir. 1977); *Sandor v. Commissioner*, 536 F.2d 874 (9th Cir. 1976); *Burck v. Commissioner*, 533 F.2d 768 (2d Cir. 1976). Each of the above cases came to the circuit court on appeal from a decision of the Tax Court. The Tax Court opinion, *Sandor v. Commissioner*, 62

Defendant argues that, when the facts in this case are examined in light of the factors stated in the ruling, it is evident that plaintiffs' prepaid interest distorted their taxable income. After a brief statement of the relevant facts, none of which plaintiffs contest, defendant's arguments will be examined in the order the factors are listed in the ruling.

In 1972, plaintiffs sold 8,400 acres of land for $700,000 and realized a $238,386 long-term capital gain. Since the long-term gain was on a capital asset, plaintiffs were entitled to exclude 50 percent of the gain and, therefore, plaintiffs' taxable income was increased by only $119,193. Plaintiffs claim, and defendant does not dispute, that, if they had so elected, they were entitled to report the gain under the installment sale provisions of section 453 of the code.[17] However, plaintiffs instead reported the entire gain on their 1972 tax return. This gain caused plaintiffs' 1972 taxable income, $106,992, to be substantially larger than their taxable income for the preceding years. Their taxable income for the 3 previous years was:

| 1971 | $15,980 |
| 1970 | $34,433 |
| 1969 | $13,206 |

On December 29, 1972, plaintiffs prepaid interest on two notes which were held by the Wachovia Bank & Trust Company, N.A., Washington, North Carolina, in order, as plaintiffs willingly admit, to offset the above capital gain. Plaintiffs made a $4,175 interest only payment on a $130,000 note, which comprised the interest due on the note through April 13, 1973. Plaintiffs

also made an interest only payment of $56,-748 on an $870,000 note, which comprised the interest due on the note through December 31, 1973.

Defendant argues that the facts in this case point to distortion of income under each of the factors listed in the ruling. First, the $60,923 interest deduction reduced plaintiffs' income from $292,546 to $231,623. This is, defendant argues, clearly a material reduction in plaintiffs' taxable income. Second, plaintiffs' 1972 taxable income was significantly greater than the 1973 tax year, $62,648; therefore, plaintiffs received a substantial tax advantage by taking the interest deduction in 1972. Third, the amount of prepaid interest, $60,-923, represented the total interest due for the following tax year. Fourth, plaintiffs prepaid the interest on December 29, 1972, 2 days before the end of the tax year. At that time, no interest was due or owing. Fifth, plaintiffs willingly admit that the interest was paid in order to reduce their 1972 tax liability. And, sixth, the interest due on the loans was based upon the fluctuation of the prime rate.[18]

As stated above, plaintiffs do not deny that the prepayment of interest was tax motivated; however, they do deny that the prepayment distorted their taxable income in a manner which would justify a reallocation of the interest deduction. Plaintiffs argue that the prepayment merely corrected the distortion of income which resulted from their election not to report their substantial capital gain under the installment method found in section 453 of the code. Plaintiffs point out that the interest paid, $60,923, is less than the gain they would

T.C. 469 (1974), aff'd, 536 F.2d 874 (9th Cir. 1976), contains a good discussion of the historical background to the issuance of Rev.Rul. 68–643.

**17.** Section 453(b)(1) of 26 U.S.C. (1976), as applicable to the 1972 tax year, states:
"(1) General rule
"Income from—
  "(A) a sale or other disposition of real property, or
  "(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the

inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,
"may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a)."

**18.** Defendant does not argue, but we note, that the fact the loan was prime-rate based should not have any bearing on our determination whether the prepayment distorted plaintiffs' income.

have been able to defer had they elected to use the installment method, $83,435. Plaintiffs further argue that the prepayment only acted to bring plaintiffs' taxable income within the range of their taxable income in the surrounding years.

Arguments similar to plaintiffs' were made by the taxpayer in *Burck v. Commissioner*.[19] In that case, a large capital gain caused the taxpayer's income to be substantially greater in the tax year in question than in surrounding tax years. The taxpayer argued, as plaintiffs do, that his prepayment of interest did not distort his income but instead reduced his taxable income to the level of a "normal" tax year.[20] The *Burck* court rejected the taxpayer's arguments and stated:[21]

> We do not accept appellant's [the taxpayer's] suggestion that it is appropriate to allow extraordinary deductions which would be distorting in the case of a level-income taxpayer but which have a "normalizing effect" when employed by a taxpayer with fluctuating income. The appellant's 1969 income was increased by a large long term capital gain. Such capital gains receive preferential treatment in our tax code predominantly for the purpose of ameliorating the harsh effects of taxing what may be several years of appreciation of a capital asset that is recognized at the time of a sale or exchange in a single year. [Footnote omitted.] Nowhere does the history or reasoning of Sections 163 and 446 suggest that Congress intended to permit extraordinary prepayment of interest to be employed as part of its preferential treatment of capital gains income. We must assume to the contrary, that Congress intended to exhaust its concern over unusual fluctuations of capital gains income in the provisions of the Code expressly adapted to that purpose. We wholly reject the notion that a substantial capital gain is a "distortion of income" which justifies distorting transactions on the deduction side to "normalize" appellant's tax burden. Rather, we conclude that capital gains are "real" income which should properly be reflected in a taxpayer's tax liability, and not "normalized" away by use of extraordinary accounting devices made available only to those who suffer the mixed pleasures of receiving such gains.  * * *

In addition to rejecting plaintiffs' argument concerning the "distortion" which resulted from recognition of a large capital gain, we reject plaintiffs' argument that their decision not to elect the installment method of reporting their land sale somehow entitles them to adjust their taxable income by deducting prepaid interest. One reason that Congress enacted the installment method of reporting the sale of certain capital assets was to take the sting out of reporting a large capital gain in one tax year. If plaintiffs decided that it was to their benefit not to report the gain in that manner, they must also bear the adverse consequences of that decision. Furthermore, we note that plaintiffs utilized another provision in the code which acts to limit the tax effects of large fluctuations in income—the income averaging provision of section 1301 of the code.

Having rejected plaintiffs' justifications for the deduction of their prepaid interest, we are still left to determine whether the deduction actually distorted plaintiffs' taxable income. Revenue Ruling 68–643 is to be applied on a "case by case basis." Since the Supreme Court has stated that the Commissioner should be given "[m]uch latitude for discretion" in his determination whether a taxpayer's method of accounting clearly reflects his income,[22] our review of the Commissioner's adjustments to plaintiffs' interest deduction must focus on the reasonableness of those adjustments. We hold that

19. *Burck v. Commissioner, supra* note 16.

20. In *Burck*, the taxpayer's interest deduction was $377,202 or 36 percent of his gross income. Here, plaintiffs' interest deduction, $60,923, is equal to 21 percent of their gross income.

21. *Id.*, 533 F.2d at 771–72.

22. *Lucas v. American Code Co.*, 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930).

the facts in this particular case support the reasonableness of the Commissioner's determination.[23]

### III.

■ The last issue which we consider is defendant's equitable estoppel claim. Defendant claims that it relied to its detriment on a letter sent to it by attorneys representing the estate of Harry McMullan, Jr. (the estate). Therefore, defendant argues, the estate should be estopped from recovering an amount equal to the necessary adjustment to the estate tax liability resulting from any reduction in 1972 income taxes paid which results from our holding in Part I of this opinion. The estate argues that defendant's claim is really equitable recoupment in sheep's clothing—a claim which we rejected in *Wilmington*. We, however, take defendant at its word that it is not claiming equitable recoupment and only consider whether the July 14, 1975, letter from the estate's attorney to the Government attorney, who was handling the audit of the estate's tax return, justifies the use of the equitable estoppel. We hold that it does.

The facts relating to this issue can be stated briefly. The federal estate tax return was filed on December 10, 1973. In a July 14, 1975, letter to the Internal Revenue Service, a member of the law firm which was listed on the estate tax return as being the "attorneys representing the estate," requested that the additional tax assessed by the Commissioner on their 1972 tax return, the tax year in this case, be allowed as a deduction on the estate return. The letter

further stated that the estate "would like to claim this amount, with the understanding that if we are able to recover any part of the Federal Income Tax Deficiencies deducted for Estate Tax purposes, the Estate Tax Liability will be adjusted accordingly."

The Government attorney stated in an affidavit, which the estate does not contest, that he allowed the deduction because of the written assurance of the estate's attorney that additional estate taxes would be paid if any of the paid income tax deficiency was subsequently recovered. In fact, the letter in question was requested by the Government attorney in his July 11, 1975, letter to the estate's attorney.[24]

On December 9, 1976, the estate filed a claim to recover the income tax deficiency which was allowed as a deduction on the estate tax return. One day later, December 10, 1976, the 3-year period of limitations for the estate tax return elapsed.[25]

The estate argues that equitable estoppel is not applicable to this case for two reasons. First, defendant could have extended the statute of limitations for the estate tax return by entering into a formal agreement with plaintiffs and, therefore, the estate's attorney's letter, since it does not constitute such an agreement, should not be given effect. Second, plaintiffs argue that defendant cannot claim that, absent the estate's attorney's letter, it would not have allowed the deduction for income taxes on the estate tax return. The Internal Revenue Code, the estate claims, required defendant to allow the deduction; therefore, it cannot be argued that defendant relied on the letter to its detriment.

**23.** We note that with the enactment of 26 U.S.C. § 461(g) (1976), the issue of how to treat prepaid interest has been resolved. 26 U.S.C. § 461(g)(1) provides:

"(1) In general

"If the taxable income of the taxpayer is computed under the cash receipts and disbursements method of accounting, interest paid by the taxpayer which, under regulations prescribed by the Secretary, is properly allocable to any period—

"(A) with respect to which the interest represents a charge for the use or forbearance of money, and

"(B) which is after the close of the taxable year in which paid, shall be charged to capital account and shall be treated as paid in the period to which so allocable."

**24.** The letter lists a number of items which needed to be sent to the Government attorney. Item 2 on the list requested "A letter from you stating that if any amounts are recovered on the pending claims for refund on decedent's income tax returns, any additional federal estate tax resulting therefrom will be paid."

**25.** The 3-year statute of limitations is set out at 26 U.S.C. § 6501 (1976).

Defendant argues that it did not have to allow the deduction for income taxes on the estate tax return and did so only on reliance on the letter. First, defendant states that section 6501(c)(4)[26] specifically excepts estate taxes from the Secretary's authority to extend the statute of limitations for the assessment of additional tax. Second, defendant argues that the Government attorney who audited the estate tax return could have denied the income tax deduction. Defendant claims that Treasury Regulation § 20.2053–1(b)(3) allows the denial of a deduction on an estate return if the dollar amount of the deduction is uncertain.[27] Furthermore, defendant argues that it could have made a protective assessment for the amount of the contested income tax liability. However, defendant claims that it did not take the above routes to protect itself because it relied on the letter in question.

We find that the statute of limitations could not have been extended for the estate tax return and that defendant had means, outside of the letter, to protect the tax due it. We find further, and the estate does not contest, that defendant clearly relied on the letter to ensure that the estate tax revenues were not lost. We now consider whether the above facts justify the application of the doctrine of equitable estoppel.

It is a basic tenet of tax law that "[a]n action for refund of taxes is essentially governed by equitable principles" and we have held that we "should apply so fundamental an equitable concept as estoppel, when the circumstances warrant, unless some Congressional enactment or valid regulation requires a different result."[28]

We hold that the circumstances in the present case warrant the application of equitable estoppel. The facts of this case are that the law firm which is named on the estate tax return as representatives of the estate sent a letter to the Government official who was auditing the estate tax return stating that any adjustments to plaintiffs' 1972 income tax liability would be reflected on the estate tax return. This letter was in direct response to the auditor's request for such a statement. It is clear that both parties intended for the Government to rely on the letter and that the Government so relied.[29] We, therefore, hold that the estate of Harry McMullan, Jr., is estopped from claiming that it is entitled to recover the amount by which its federal estate tax liability is increased as a result of any refund of its 1972 federal income taxes resulting from this case.[30]

---

**26.** 26 U.S.C. § 6501(c)(4) provides:

"(4) Extension by agreement

"Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, *except the estate tax provided in chapter 11*, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon." (Emphasis supplied.)

**27.** Treas.Reg. § 20.2053–1(b)(3) (1972) provides:

"(3) Estimated amounts. An item may be entered on the return for deduction though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and will be paid. No deduction may be taken upon the basis of a vague or uncertain estimate. If the amount of a liability was not ascertainable at the time of final audit of the return by the district director and, as a consequence, it was not allowed as a deduction in the audit, and subsequently the amount of the liability is ascertained, relief may be sought by a petition to the Tax Court or a claim for refund as provided by sections 6213(a) and 6511, respectively."

**28.** *Erickson v. United States*, 159 Ct.Cl. 202, 209, 309 F.2d 760, 763 (1962), and cases cited therein.

**29.** We reject plaintiffs' argument that defendant has raised this offset too late in the proceedings. The only basis upon which such an argument could be supported would be that plaintiffs have somehow been prejudiced by the timing of the defendant's claim. However, plaintiffs fully argued the issue in their reply brief and were, therefore, clearly not so prejudiced. *See Hess v. United States*, 210 Ct.Cl. 483, 537 F.2d 457 (1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).

**30.** If plaintiffs have failed to protect the period for recovery for the tax years to which the interest paid in 1972 is properly allocable, it appears that an equitable adjustment may be

We conclude, after hearing oral argument, that both motions for summary judgment are allowed in part and denied in part for the reasons stated in our opinion. The case is remanded to the trial division for a determination of the amount of plaintiffs' recovery.

available to them under the mitigation provi-    sions of the code.