MONTEGO BAY IMPORTS, LTD.,
Vinton H. Salkey and Sylvia
S. Salkey, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 90–322C.

United States Claims Court.

April 9, 1992.

James S. Mattson, Key Largo, Fla., attorney of record for plaintiffs.

Mark A. Melnick, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

GIBSON, Judge.

*Introduction*

This claim, originally brought as (i) a claim for the unlawful destruction of a vessel; (ii) the illegal exaction of a fine or penalty; and (iii) a "taking" of property without due process in 1985 (*i.e.*, Claims Court No. 414–85C) and dismissed for lack of subject matter jurisdiction because it sounded in tort and resultantly transferred to the United States District Court for the Southern District of Florida, was *re-filed* in this court as one in contract on April 12, 1990. Again, we are constrained to dismiss for lack of subject matter jurisdiction under four alternative rationales: (i) *res judicata;* (ii) issue preclusion; (iii) lack of contract; and (iv) subject complaint is an action sounding in tort.

1. The SBA is an agency of the United States Government.

2. Actually, only $110,000 related to the purchase of the vessel. The additional $40,000 was utilized for leasehold improvements, operating expenses, and the purchase of equipment.

*Facts*

On April 20, 1981, Montego Bay Imports, Ltd., a District of Columbia corporation, borrowed $150,000 from the Small Business Administration (SBA)[1] to purchase a fishing vessel called the F/V King David.[2] A Deed of Trust on real property located in Washington, D.C. was executed by Vinton H. Salkey and Sylvia S. Salkey (the Salkeys) to guarantee said SBA loan. In addition, pursuant to the note, the F/V King David was subject to a First Preferred Ship Mortgage executed in favor of the defendant. The F/V King David was subsequently "lost to a casualty" and, with the proceeds from insurance and the permission from the SBA, a new fishing vessel named F/V CHANTAL S was purchased.[3]

Thereafter, on April 16, 1985, at which point the CHANTAL S had a value of $215,000 and the principal amount due on the note was of $120,000, the United States Coast Guard (USCG) COURAGEOUS encountered said vessel approximately 13 miles off the coast of Cuba. *Montego Bay Imports, Ltd. v. United States*, 10 Cl.Ct. 806, 808 (1986). Coast Guard personnel then boarded the CHANTAL S and conducted a search of the vessel with permission of the master. The entailing search led to the discovery of a controlled substance, and, as a consequence, the crew was subsequently placed under arrest for importation of a controlled substance and the CHANTAL S was seized subject to 21 U.S.C. § 881, *i.e.*, the customs/forfeiture law of the United States.

The next day the USCG commenced escorting the CHANTAL S with the BEAR, switching from the COURAGEOUS. Following the change in escort vessels, the BEAR crew was forced to turn off the engine of the CHANTAL S as a result of a ruptured intake hose. Subsequent events caused the commanding officer of the BEAR, at approximately 4:30 p.m. on April

3. The First Preferred Ship Mortgage carried over to the F/V CHANTAL S, and the CHANTAL S was also a documented vessel of the United States.

17, 1985, to order the sinking of the CHANTAL S, because he determined that said vessel was endangering the passage of surrounding boats. Consequently, the plaintiff (Montego Bay Imports Ltd. only) on the same day filed separate complaints in the Claims Court (No. 414–85C) and in the United States District Court for the Southern District of Florida, Miami Division (No. 86–2103–CIV–DAVIS), on or about July 16, 1985.

In the complaint in No. 414–85C, plaintiff Montego Bay Imports Ltd. claimed that:

> As a result of their destructive actions on April 14, 16, and 17, 1985, the unidentified officers and agents of the United States Coast Guard vessels ALERT, COURAGEOUS, and BEAR *took* plaintiff's property, the F/V CHANTAL S, on behalf of defendant The United States, without either due process or adequate compensation, for which *taking* defendant is liable to plaintiff pursuant to the United States Constitution, Fifth Amendment.

Defendant's Motion To Dismiss (DMD), Appendix at 28; Pltf's original complaint (emphasis added).

In the separate complaint in the district court, the plaintiff raised two allegations. The first count alleges that the "actions of defendant's officers and employees constitute maritime torts for which a private party would be liable to plaintiff if it were the owner of the USCG vessels." *Id.* at 31. On this basis, the plaintiff contended that the United States was "liable to the plaintiff for damages, prejudgment interest, and counsel fees pursuant to 46 U.S.C. § 742." *Id.* Secondly, the plaintiff requested declaratory relief by demanding that the note to the SBA be declared *paid in full* by this court since the defendant seized and destroyed collateral worth $200,000, which plaintiff was relying upon to repay the loan. *Id.* at 32.

Instead of filing an answer to the initial Claims Court action, the defendant moved to dismiss for lack of jurisdiction over the subject matter. During oral argument on the defendant's motion to dismiss in No. 414–85C, the plaintiff requested that its case be transferred to the United States District Court for the Southern District of Florida if it was determined that no jurisdiction existed in the Claims Court. Accordingly, in *Montego Bay Imports, Ltd.*, 10 Cl.Ct. at 810, this court dismissed plaintiff's complaint on September 29, 1986, for lack of subject matter jurisdiction and granted plaintiff's request to transfer the tort case to the district court.

The Claims Court, Judge Margolis, stated several grounds for its dismissal. First, the court noted that at the heart of the plaintiff's claims was the "alleged unlawful destruction of the CHANTAL S by the USCG." *Id.* at 808. The court went on to observe that:

> If the CHANTAL S had not been destroyed after seizure and no forfeiture proceedings had been conducted, it is clear that plaintiff would have no claim within the jurisdiction of the Claims Court. In that situation, the plaintiff would be limited to administrative review and, ultimately, suit in the United States District Court.[4] ... A claim for "unlawful destruction" of property and, therefore, for the impropriety of the acts of government officials, sounds in tort.

*Id.* Since the Claims Court has no jurisdiction over claims sounding in tort, plaintiff's allegation of tortious conduct was held not to vest jurisdiction with respect to case § 414–85C.

The plaintiff also alleged in case § 414–85C a taking without just compensation or due process. In opposition, the defendant argued that since the CHANTAL S was a hazard to navigation, the destruction and sinking of the vessel was within the government's "police power" and also the statutory authority to "destroy ... floating dangers to navigation" pursuant to 14 U.S.C. § 88(a)(4). *Id.* at 809. The court

---

4. *See* 15 U.S.C. § 634(b)(1) which provides in pertinent part that: "... the Administrator [SBA] may sue and be sued ... in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy...."

there noted that "police power" is an exception to the principle of compensation for property taken. *Id.* However, the court was unwilling to make a decision regarding the proper utilization of police power in this instance. Nevertheless, it was noted that "no 'process' is due prior to the seizure and, if necessary, prior to the destruction of property pursuant to the government's police power." *Id.* In addition, the court stated that "even if process were due in such a circumstance, [it] could provide no remedy [since] claims for solely due process violations are not within this court's jurisdiction." *Id.*

Moreover, the court explained that an essential characteristic of a taking is "the government's use of 'rightful property, contract, or regulatory' power to control property which it is unwilling to purchase," and because the plaintiff in this case is asserting that the defendant's acts were "unlawful and unauthorized, the acts cannot constitute a taking sufficient to vest jurisdiction in the Claims Court." *Id.* It was further noted that the "remedy for government wrongdoing in destroying property is an action for tortious conduct." *Id.*

Finally, in response to the plaintiff's contention that defendant's unlawful destruction of the vessel resulted in an illegal exaction of a fine or penalty for which this court could properly find jurisdiction, the court stated that it could not find any support fixing jurisdiction here based on *destruction* rather than a taking of property. *Id.* at 810. As a result, the court dismissed the complaint in case no. 414–85C, and transferred plaintiff's tort action to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1631. *Id. Montego Bay Imports, Ltd., Vinton H. Salkey and Sylvia S. Salkey v. United States*, No. 86–2103–CIV–DAVIS, slip op., 1990 WL 98044 (S.D.Fla., Jan. 2, 1990).

With respect to the district court action, the plaintiffs brought that claim seeking damages for the USCG's destruction of the CHANTAL S pursuant to the Suits in Admiralty Act (SAA), 46 U.S.C. § 741, and the Public Vessels Act (PVA), 46 U.S.C. § 781. The district court explained that the SAA was passed "to provide plaintiffs with a cause of action *in personam* against the United States for damages" resulting from the actions of merchant vessels. *Id.* at 8–9. It was also held by the district court that the PVA was enacted to allow parties to bring suit against the United States in admiralty if such party was injured by a public vessel. *Id.* at 9. Moreover, the court noted that neither the SAA nor the PVA "expressly provides an exception for 'discretionary acts' of government personnel, such as is found in the Federal Tort Claims Act." *Id.* However, the district court nevertheless agreed with the defendant's assertion that the court lacked jurisdiction over the subject matter of this case. In this connection, the court stressed that the United States Court of Appeals for the Eleventh Circuit has held that cases filed pursuant to the SAA and the PVA "implicitly contain a discretionary function exception to the United States' waiver of sovereign immunity." *Id.* Specifically, the district court relied on the observations in *United States Fire Ins. Co. v. United States*, 806 F.2d 1529, 1536 (11th Cir.1986), which states that:

> [I]n addition to shielding the government from liability for its negligent policy decisions, the discretionary function exception also shields the government from liability for the allegedly negligent acts of those individuals who were "carrying out the operations of government in accordance with official directions." ... [The Government is shielded] from tort liability for its subordinates' negligence only where the alleged negligent acts were "dictated by guidelines adopted at the policy-making level." ... In particular, where the government employee's allegedly negligent acts were permitted under a government manual, the discretionary function exception clearly applies only where the manual either required that the employee commit the allegedly negligent acts or stated that the procedure used was the preferred procedure for achieving the goal in question.

*Id.* at 10. Upon applying the foregoing principles, the district court found that the "destruction of the CHANTAL S was in accordance with established [USCG] Policy" because the "Commanding Officer ... determined that towing the vessel to port endangered the lives of his custody crewmen and posed a hazard to navigation because of the heavy traffic in the Old Bahamas Channel." *Id.* at 10–11. As a result of this analysis, the district court held that the "discretionary function exception applies to abrogate federal subject matter jurisdiction over this action." *Id.* at 11. As to the plaintiffs' additional claims, *i.e.*, request for declaratory judgment, etc., the court held that they were "rendered academic and the Court need not address them." *Id.* at 12 n. 23 (DMD, Appendix at 50).

The plaintiffs [5] appealed the foregoing district court dismissal to the United States Court of Appeals for the Eleventh Circuit, arguing that the decisions to place the particular commanding officer in charge and scuttle the CHANTAL S were not within the discretionary function exception. Therefore, the plaintiffs argued that dismissal for lack of jurisdiction for subject matter was inappropriate. Shortly following the appeal, on June 11, 1990, plaintiffs filed a motion in the Eleventh Circuit to bifurcate their appeal, *i.e.*, "of the Claims Court's transfer order and the district court's final judgment, reserving the question of transferring the appeal of the Claims Court's order to the Court of Appeals for the Federal Circuit pursuant to 28 U.S.C. § 1631, on the ground that the [Federal Circuit] has exclusive jurisdiction to review the Claims Court order." DMD, Appendix at 53. In short, plaintiffs' strategy was that the parties should submit pleadings only to the Eleventh Circuit directed toward the district court's dismissal for lack of subject matter jurisdiction, thereby seeking to preserve their ability to subsequently appeal the Claims Court's transfer order to the Federal Circuit pursuant to 28 U.S.C. § 1631, if the Eleventh Circuit was to affirm the district court.

DMD, Appendix at 53. The defendant opposed this motion, arguing that plaintiffs proffered no support therefor and that such a bifurcation should be disfavored because it would result in an inefficient commitment of the limited resources of the federal appellate courts, *citing to United States v. Hohri,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987).

Meanwhile, on April 12, 1990, the plaintiffs (Montego Bay Imports Ltd. and the Salkeys) filed the subject complaint (No. 90–322C) in the Claims Court, based on facts identical to those pled in the first complaint(s), *supra.* In subject complaint at bar, the plaintiffs averred several allegations, the most important of which are as follows:

20. Defendant disposed of the collateral [on the note] without notice to plaintiffs, destroying plaintiffs' rights of redemption therein, and in a commercially unreasonable manner.

\* \* \* \* \* \*

23. As a result of defendant's destruction of the CHANTAL S ... the SBA declared [the note] due and plaintiffs SALKEYS' [sic] appeared to be potentially personally liable, and their real property which was pledged as security [for the note] became potentially subject to foreclosure.

24. In or about June 1985, employees of the SBA informed the SALKEYS that they were still obligated to make $2,000 monthly payments [on the note] and, if they did not do so, the mortgages on their real estate in the District of Columbia would be foreclosed.

25. Plaintiffs reasonably relied on the statements of defendant's SBA officials to the effect that they were still liable on [the note].

26. To prevent foreclosure on their real estate, plaintiffs made payments totalling $96,000 between the date of the destruction of the CHANTAL S and the

5. In 1987, and prior to the decision by the district court on January 2, 1990, Vinton H. and

Sylvia S. Salkey joined in the district court action as party plaintiffs.

date said loan was assumed by Junius,[6] to the SBA, while plaintiffs sought recovery of the value of the CHANTAL S in the Claims Court (Case No. 414–85C), on a claim for inverse condemnation, and in the United States District Court for the Southern District of Florida on a claim for a maritime tort.

\* \* \* \* \* \*

29. Plaintiffs' $96,000 in payments only reduced the principal amount of [the note] approximately $30,000, from $120,-000 to approximately $90,000 when it was assumed by Junius.

30. Plaintiffs paid $96,000 to defendant based upon the mistaken belief that the money was owed to defendant, or was unjustly enriched, or as the result of illegal exaction by [the SBA], and are entitled to a return of said $96,000, plus interest on each payment from the date it was made.

31. Defendant deprived plaintiffs of collateral with a value of $215,000 on April 16, 1985. After accounting for the approximately $120,000 balance due on [the note] on [April 16, 1985], defendant received an excess, or was unjustly enriched, in the amount of $95,000 on [April 16, 1985].

32. The third-party purchaser of plaintiffs' business, Junius, has, upon information and belief, reduced the principal on [the note] below the $90,000 which was allegedly due when he assumed the note, and plaintiffs are entitled to the amounts paid defendant by Junius.

Plaintiffs' Complaint at 4–6. More specifically, the plaintiffs at bar demand, *inter alia,* the following relief:

(a) $96,000, plus prejudgment interest from the date of each payment:

(i) for money damages paid by mistake; or

(ii) as unjust enrichment; or

(iii) as the result of an illegal exaction by the defendant;

(b) plus $95,000, plus prejudgment interest from April 16, 1985:

(i) for the excess amounts realized by the defendant; or

(ii) for the unjust enrichment realized by the defendant, by the seizure of the CHANTAL S; and

(c) reformation or rescission of the SBA note dated April 20, 1981, to reduce the outstanding balance to zero;

(d) repayment of all moneys paid to defendant on the note since it was assumed by Junius;

(e) satisfaction of the outstanding mortgages on SALKEYS' real estate in Washington, DC, made by plaintiffs in favor of defendant[.]

*Id.* at 6–7.

In response to the plaintiffs' second complaint in this court, the defendant moved to dismiss on July 10, 1990, pursuant to RUSCC 12(b). Plaintiff subsequently filed an opposition to the motion to dismiss on September 5, 1990, and defendant's reply followed on September 28, 1990. This opinion addresses the merits of the foregoing pleadings.

*Contentions of the Parties*

1. *Defendant*

In support of its motion to dismiss for lack of subject matter jurisdiction, the defendant proffers six broad contentions.

Defendant's first contention is that the Claims Court lacks jurisdiction to entertain the case "because the same cause of action is pending before the United States Court of Appeals for the Eleventh Circuit." Specifically, the defendant refers to 28 U.S.C. § 1500 which states that:

The United States Claims Court shall not have jurisdiction of any claim for or in respect to which the plaintiff ... has pending in any other court any suit or process against the United States....

Moreover, defendant argues that since both suits arose out of the same operative facts and demand the same type of relief, the § 1500 statutory terminology is satisfied as articulated in *Beauregard Parish Police*

---

**6.** Obligations under the promissory note were assumed by a third party, Sefton Roy Junius (Junius) on February 25, 1989. Junius agreed to pay the indebtedness and remain obligated until the loan is fully paid. The Salkeys also remained guarantors. DMD at 4 n. 3.

*Jury v. United States,* 16 Cl.Ct. 344, 345 (1989).

The second argument offered by defendant is that since the issue of whether plaintiffs' claim sounds in contract or tort was previously litigated before this court in 1985, plaintiff is barred by the doctrine of issue preclusion from introducing that claim again. Defendant expressly notes that this court stated in its 1986 opinion that "at the heart of plaintiffs' claims ... is the allegedly unlawful destruction of the CHANTAL S by the USCG." *Montego Bay Imports, Ltd.,* 10 Cl.Ct. at 808. Therefore, defendant asserts that simply because the plaintiffs have averred different legal conclusions from the identical facts in the previous case, such as unlawful destruction in a "commercially unreasonable manner" and "unjust enrichment," these allegations nevertheless arise from "the alleged unlawful destruction of the CHANTAL S by the USCG."

The defendant's third argument is *res judicata.* Specifically, the defendant posits that the plaintiffs' bland re-characterization of this action from one sounding in tort to one sounding in contract should be dismissed because "the doctrine of *res judicata* prevents litigation of all grounds for recovery that were previously available to the parties, regardless of whether they were asserted or determined in a prior proceeding," *citing to Chico County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *Huntley v. United States,* 4 Cl.Ct. 65, 68 (1983). In addition, the defendant asserts that even though the first suit was dismissed for lack of subject matter jurisdiction, *res judicata* prevents subsequent suits where jurisdiction is again being averred. *Oglala Sioux Tribe v. Homestake Min. Co.,* 722 F.2d 1407, 1411 (8th Cir.1983), and *Magnus Electr., Inc. v. La Republica Argentina,* 830 F.2d 1396 (7th Cir.1987).

The fourth contention is that even if *res judicata* does not preclude plaintiffs from asserting a second claim, the claim should nevertheless be dismissed because it sounds in tort, thereby failing to satisfy the Tucker Act jurisdictional requirement. *Id.* at 16–18. Specifically, defendant argues that the essence of plaintiffs' allegations is that "the SBA improperly required payments on the promissory note after the USCG allegedly wrongfully deprived Montego of the CHANTAL S." *Id.* at 16–17. Thus, the defendant contends, the claims of unlawful destruction and improperly required payments sound in tort and not in contract.[7] *Id.* at 17. For example, it is argued by defendant that plaintiffs' allegation of improperly required payments on the note was "in essence, a tort claim against the [g]overnment for 'misfeasance and misconduct,'" which sounds in tort. *Id.* at 17–18. In addition, defendant alleges that this action is "analogous to an action for an allegedly wrongful conversion of the [CHANTAL S], which is a tort." *Id.* at 18.

Defendant's fifth argument is premised on the assertion that even though plaintiffs are attempting to attain jurisdiction by alleging a claim on a contract with the United States, there actually exists no contract the breach of which grants plaintiffs the right to sue the government in this case. *Id.* at 18–19. Rather, defendant asserts that the primary note, guarantees on the note, deed of trust and first preferred ship mortgage were issued by the plaintiff(s) only as security for the loan, and are not contracts by the government to pay money to plaintiff(s) in the event the collateral "is destroyed by a governmental entity." *Id.* at 19. It is further argued by defendant that even "if there were an implied warranty by the SBA not to impair plaintiffs' collateral, that warranty does not extend to the actions of another agency, such as the USCG." *Id.* at 19 n. 9. Moreover, defendant states that plaintiff(s) "made no allegation that there was a meeting of the minds ... concerning the terms

---

**7.** To the extent that plaintiffs aver relief under the theory of *unjust enrichment,* this is clearly a suit based upon a contract implied in law and outside of our jurisdiction. *EWG Assocs. Ltd. v.* *United States,* 231 Ct.Cl. 1028 (1982); *Fincke v. United States,* 675 F.2d 289, 230 Ct.Cl. 233, 246 (1982).

of any contract[8] between them which would give Montego the right to sue the SBA on the promissory note, the personal guarantees or the first preferred ship mortgage." *Id.* at 20. It is vehemently argued by the defendant, therefore, that the promissory note actually indicates a contrary position to the effect that the holder of the note has no duty to preserve the collateral. *Id.* For example, said note states that:

> The undersigned agrees to take all necessary steps to administer, supervise, preserve, and protect the Collateral *and regardless of any action taken by Holder, there shall be no duty upon Holder in this respect.*

DMD, Appendix at 9 (emphasis added). However, it is also noted by the defendant that the guarantees supporting the promissory note state that:

> The obligations of the Undersigned [the Salkeys] hereunder, and *the rights of Lender* [the SBA] *in the collateral, shall not be released, discharged or in any way affected, nor shall the Undersigned have any rights against Lender . . . by reason of any* deterioration, *waste, or loss* by fire, theft, or *otherwise of any of the collateral, unless such* deteriorations, *waste, or loss be caused by the willful act or willful failure to act of Lender.*

*Id.* at 15 (emphasis added). The defendant asserts, in view of the foregoing explicit provisions, that this language of the guarantee "extends only to the loss of the collateral due to an act of the SBA [*i.e.*, the Lender] . . . and not the USCG." DMD at 21. The final assertion by the defendant with respect to this particular contention is that the interest of the SBA in a vessel covered by a first preferred ship mortgage will not terminate if said vessel is forfeited merely because of a violation of law. The defendant relies on a provision in the federal statutes which explicitly provides that such right would terminate *only if* the government entity which possessed the mortgage "authorized, consented, or con-

spired to do the act, failure, or omission that is the basis of the violation." 46 U.S.C. § 31327 (1988). Since defendant argues that plaintiff has not alleged facts indicating that the SBA "authorized, consented, or conspired" the transportation of the controlled substance that eventually led to the scuttling of the CHANTAL S, defendant asserts that the first preferred ship mortgage does not give rise to a cause of action against the SBA.

The sixth and final contention postured by the defendant is that the action should be dismissed because plaintiffs have failed to join an indispensable party, Sefton Roy Junius, the third-party purchaser of the promissory note. DMD at 24.

### 2. Plaintiffs

Plaintiffs' opposition to each of defendant's contentions will be discussed in turn. With respect to defendant's first contention, that the Claims Court lacks jurisdiction to entertain the case in view of § 1500 because the same cause of action is pending in the Eleventh Circuit, plaintiff moved for a stay of proceedings in the Claims Court on August 31, 1990, *pending resolution in the Court of Appeals.* On April 4, 1991, however, the United States Court of Appeals for the Eleventh Circuit affirmed the decision of the United States District Court for the Southern District of Florida, holding that the decision to scuttle the CHANTAL S was "clearly within the discretionary function exception" of the SAA and the PVA, 931 F.2d 902 (11 Cir.1991). The notice of the filing of this decision was not filed by the plaintiffs in the Claims Court until October 21, 1991. Inasmuch as the Eleventh Circuit has affirmed the district court, defendant's contention as to the stay issue is now moot, thus plaintiffs' motion to stay was denied by order dated March 6, 1992. Moreover, we further hold that inasmuch as no action is pending in another court at the time of the decision *herein* on the defendant's § 1500 motion to dismiss, said motion is hereby denied on the

---

**8.** Defendant also argues that since no express or implied-in-fact contract exists to provide jurisdiction for the relief sought, no legal basis exists, *i.e.*, a contract, upon which to premise recision, restitution, or reformation as a measure of damages. *Cf. Chernick v. United States,* 372 F.2d 492, 178 Ct.Cl. 498 (1967).

authority of *UNR Industries, Inc. v. United States,* 911 F.2d 654 (Fed.Cir.1990).

With respect to defendant's sixth contention that plaintiffs failed to join an indispensable party, plaintiffs also moved on August 31, 1990, in a separate motion, to join Junius as a party plaintiff pursuant to RUSCC 19. Defendant thereafter opposed plaintiffs' motion on September 28, 1990, stating that said motion is untimely and that no good cause or other rationale is shown as to why a motion to join Junius was not averred at the filing of the complaint. We have already ruled on plaintiffs' motion, holding that Junius does not have an interest in the pending case. Plaintiffs' motion was, therefore, denied on March 6, 1992. Defendant's motion to dismiss with respect to this contention is, as a consequence, also denied as moot.

With respect to defendant's second argument concerning issue preclusion, plaintiffs respond by stating in their opposition that the government's contention that "commercially unreasonable" is the equivalent of "unlawful" as stated in the 1985 complaint is incorrect. *Id.* at 4. Specifically, plaintiffs assert that an "action can be 'unreasonable' under the Uniform Commercial Code, give rise to contractual remedies, and not be 'unlawful' or tortious." *Id.* In addition, plaintiffs contend that there was no final adjudication in the 1986 Claims Court decision but only a transfer to the district court and therefore a finding of lack of jurisdiction cannot satisfy the burden of issue preclusion. *Id.* at 4–5. That circumstance, while possibly true when plaintiffs filed their opposition to defendant's motion to dismiss on September 5, 1990, is not true at this instant inasmuch as the Eleventh Circuit, on April 4, 1991, 931 F.2d 902, affirmed the district court's decision dismissing the case transferred from the Claims Court on September 29, 1986, 10 Cl.Ct. 806.

Plaintiffs' next response addresses defendant's *res judicata* assertion, *i.e.,* its third argument. First, plaintiffs state that the Salkeys "have never litigated the matter of their $96,000 in payments made between 1985 and 1989" to the SBA, and that they made these payments pending the outcome of the 1985 claim in order to "prevent a default on the SBA loan and foreclosure against *their* Washington, DC real estate." *Id.* at 5. Moreover, plaintiffs contend that they did not make *any* of the 48 payments until after the SBA notified them that the loan was in default on July 2, 1985, and that the initial action in the Claims Court (No. 414–85C) was filed on July 16, 1985, *before* plaintiffs commenced *any* of the 48 payments. *Id.* In addition, plaintiffs assert that the Salkeys were not parties to the original (No. 414–85C) claim, and that it was not until the 414–85C Claims Court case was transferred to the district court that they moved to intervene in 1987. *Id.* Therefore, plaintiffs argued that it was no longer possible to amend the complaint for jurisdictional reasons to seek recovery of $10,000 in mistaken payments.

As to the $95,000 claim for the loss of the CHANTAL S on a breach of contract theory, plaintiffs assert that no *final* judgment on the merits, or jurisdiction, has been ordered that would allow *res judicata* to control in this case. *Id.* The plaintiffs also contend that the Claims Court's 1986 order, on which the defendant relies, is on appeal and therefore cannot serve as a bar to this claim because it is not a final order. *Id.* at 5–6. However, as noted *supra,* the Eleventh Circuit affirmed the district court's opinion on April 4, 1991, 931 F.2d 902, and therefore this point is moot.

Plaintiffs' next contention addresses defendant's fourth argument, which asserts that even if *res judicata* does not bar the action, the action still sounds in tort and therefore the Claims Court lacks jurisdiction. Conversely, plaintiffs argue that the "instant claim is not one for conversion, misfeasance, or misconduct," as the government contends. *Id.* at 6. Rather, it is proffered that "they made $96,000 in payments to the SBA out of legitimate concern that they could not raise their 'innocent owner' defense in D.C. Superior Court foreclosure action." *Id.* at 6–7.

With respect to defendant's fifth argument contending that there is no contract the breach of which grants plaintiffs the

right to sue the government in an action for any breach in this case, plaintiffs first assert that where there is a motion to dismiss, "all well-plead allegations of the complaint ... must be taken as true," thus defendant's position is premature on this motion. *Id.* at 7. In addition, plaintiffs state that "where the elements of contracts appear, ... the Claims Court, like most courts today, requires only notice pleading." *Id.* at 7–8.

Secondly, plaintiffs vehemently assert that certain remedial provisions of the Uniform Commercial Code (UCC) are part of an express contract with the United States. Specifically, plaintiffs point to the "Authorization and Loan Agreement" which contains references to the UCC on the issue of collateral. DMD, Appendix at 11.

Plaintiffs' final contention with respect to this issue is that the Deed of Trust executed by the Salkeys "provides for liability to plaintiffs [against defendant] if there is any 'deterioration, waste, or loss' of the collateral caused by the 'willful act or willful failure to act of Lender.'" Pltfs' Opposition at 9. Therefore, since plaintiffs argue that actions in this court are *only* against the United States, and the SBA and the USCG are mere agencies thereof, then the United States through the SBA is liable under this contractual obligation as to which it failed to adhere.

*Discussion*

1. *Motion To Dismiss*

■ Pursuant to RUSCC 12(b), the defendant has filed a motion to dismiss plaintiffs' complaint for lack of subject matter jurisdiction. Generally, determinations pursuant to RUSCC 12 motions to dismiss are normally limited to the pleadings. In this connection, "it is well established that facts alleged in the complaint are usually construed in a light most favorable to the non-movant." *Cupey Bajo Nursing Home, Inc. v. United States*, 23 Cl.Ct. 406, 411 (1991). *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (the threshold question in addressing complaints which are dismissed for lack of subject matter jurisdiction is— whether the court "acted prematurely and

hence erroneously in dismissing the complaints on the stated ground, thus precluding any opportunity for plaintiffs by subsequent proof to establish a claim"). As a result, when addressing motions to dismiss for lack of jurisdiction, the alleged facts in the complaint are usually deemed to be true and correct for the limited purposes of the motion. *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988) (citations omitted). Thus, on a motion to dismiss whether for lack of jurisdiction over the subject matter or for failure to state a claim, "unchallenged allegations of the complaint should be construed favorably to the pleader." *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir.1989) (citations omitted). On the other hand, "if a motion to dismiss for lack of subject matter jurisdiction ... challenges the truth of the jurisdictional facts alleged in the complaint, the ... court *may* consider relevant evidence in order to resolve the factual dispute." *Reynolds*, 846 F.2d at 747 (emphasis added and citations omitted) (the court noted there that because the plaintiff's "amended complaint alleged that she served pursuant to a contract, this allegation, left unchallenged, would be sufficient to support Tucker Act jurisdiction"). Finally, it should also be noted that as a general principle, the non-movant bears the burden of establishing subject matter jurisdiction by a "preponderance of the evidence." *Id.* at 748. As previously observed, two of the defendant's six dismissal contentions have become moot, *i.e.,* 28 U.S.C. § 1500, duplicative claims, and Rule 19 failure to join an indispensable party. Given this circumstance, we will, therefore, address below the remaining four bases the defendant contends support the motion to dismiss.

2. *Res Judicata*

■ Defendant's third argument outlined above is *res judicata*. As a general rule, *res judicata*, also known as claim preclusion—

provides that when a final judgment has been entered on the merits of a case, "[i]t is a finality as to the claim or demand in

controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

*Magnus Electr., Inc. v. La Republica Argentina,* 830 F.2d at 1400, *citing Nevada v. United States,* 463 U.S. 110, 129–30, 103 S.Ct. 2906, 2918, 77 L.Ed.2d 509 (1983), *quoting Cromwell v. County of Sac,* 94 U.S. (4 Otto) 351, 352, 24 L.Ed. 195 (1876). The doctrine of claim preclusion "operates between parties simply by virtue of final judgment, whereas issue preclusion applies only to issues actually litigated." *Bass v. United States,* 11 Cl.Ct. 295, 298 (1986), *citing Nevada,* 463 U.S. 110, 130, 103 S.Ct. 2906, 2918, 77 L.Ed.2d 509 (1983).

■ A very important facet of the doctrine is that it "extends beyond those causes of action *expressly* included by the plaintiff in his claim to cover causes of action which were not but *should have been* raised in the prior litigation." *Brown v. United States,* 3 Cl.Ct. 31, 41 (1983) (emphasis added), *citing Container Transport Int'l, Inc. v. United States,* 468 F.2d 926, 928, 199 Ct.Cl. 713, 717 (1972). Therefore, *res judicata* or claim preclusion prohibits a plaintiff "from asserting the same transactional facts under a different cause of action." *Bass,* 11 Cl.Ct. at 298, *citing Young Engineers, Inc. v. ITC,* 721 F.2d 1305, 1314 (Fed.Cir.1983). The underlying rationale for this legal principle is to encourage "reliance on judicial decisions, prevent vexatious litigation, and permit courts to resolve other pending suits being litigated for the first time." *Brown,* 3 Cl.Ct. at 41, *citing Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979). With respect to making a determination—whether an issue or cause of action *should have been* raised in a prior proceeding—

the modern trend is . . . to insist first, that a plaintiff raise his entire "claim" in one proceeding, and second, to define

"claim" to cover all the claimant's rights against a particular defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. In deciding what factual grouping constitutes a transaction and what groupings make a series of connected transactions, the tribunal acts pragmatically, giving way to such considerations as whether the facts are related in time, space, motivation or the like so as to form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. (citations omitted)

*Brown,* 3 Cl.Ct. at 41, *citing Container Transport,* 468 F.2d at 928–29, 199 Ct.Cl. at 717.

In arguing that the doctrine of *res judicata* should *not* bar this action notwithstanding the 1986 Claims Court decision in *Montego Bay Imports, Ltd. v. United States,* 10 Cl.Ct. 806 (1986) (*Montego Bay I*), dismissing the claims because they sound in tort and transferring same to the district court, plaintiffs assert that the requirements of *identity of parties* and *final adjudication in the prior case* do not *exist.* Specifically, with respect to the $96,000 in mistaken payments, plaintiffs argue that the Salkeys never litigated the matter, and made those payments while awaiting the outcome of the claim filed in *Montego Bay I* in 1985. More importantly, plaintiffs contend that *Montego Bay I* was filed on July 16, 1985, *before* any of the $96,000 was paid and that the Salkeys were not even parties to that 1985 suit. With respect to the $95,000 claim stemming from the loss [9] of the CHANTAL S on a breach of contract theory, plaintiffs proffer that there was *no final judgment on the merits or on jurisdiction* that would allow the doctrine of claim preclusion to apply.

A close analysis of the critical elements of the doctrine of *res judicata,* however, convinces us that plaintiffs are incorrect in

---

9. This loss was based upon the following facts on or about April 16, 1985: Value of the CHANTAL S $215,000; balance of the obligation of the note to the SBA $120,000; the difference of $95,000 is plaintiffs' alleged equity value.

their interpretation, and that *res judicata* does apply in this case to prevent plaintiffs from instituting their claim.

First, it is an established principle that—

the underlying policy of res judicata is not restricted to a valid judgment that deals solely with the merits; it extends to and includes matters in abatement, such as jurisdiction of the subject matter. . . .

*Magnus Electr., Inc.*, 830 F.2d at 1400, *citing* 1B J. Moore, J. Lucus & T. Currier, *Moore's Federal Practice* ¶ 0.405[5], at 223 (2d ed. 1984) (footnote omitted); *see Dozier v. Ford Motor Co.*, 702 F.2d 1189, 1191 (1983) ("the doctrine of *res judicata* applies to dismissal for lack of jurisdiction as well as for other grounds. . . ."). Moreover, a "dismissal other than one on the merits merely precludes relitigation of the issues decided." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1277 (1983), *citing Harper Plastics, Inc. v. Amoco Chems. Corp.*, 657 F.2d 939, 943 (7th. Cir.1981). The jurisdiction of the Claims Court over the subject matter of the claims was clearly litigated in the 1985 claim, although the plaintiffs argue that certain theories were not then litigated and the required parties were not present. The 1985 claim involved litigation concerning whether this court possessed the requisite jurisdiction under the Tucker Act, 28 U.S.C. § 1491 [10] (1988), to entertain the action averred in *Montego Bay I*. This court held in 1986, in *Montego Bay I*, that plaintiffs' claim sounded in tort and therefore dismissed it for lack of subject matter jurisdiction. Now, averring the identical fact transaction pattern underlying the prior claim (*Montego Bay I*), plaintiffs here are now attempting to establish subject matter jurisdiction pursuant to the Tucker Act merely through allegations which simply posture a *different theory* as to the cause of action by sounding in contract. The question remains, therefore, whether the requisite criteria are present for the application of claim preclusion.

### a. *Identity of the Parties*

█ It is true that the Salkeys were not named plaintiffs in the 1985 claim *i.e.*, *Montego Bay I*, Cl.Ct. No. 414–85C. However, the doctrine of claim preclusion only requires, at the minimum, that the Salkeys were in "privity" with Montego Bay in the original action, and not that they were actual named parties thereto. *See Brown*, 3 Cl.Ct. at 41. The question exists, therefore, whether the Salkeys were in privity with Montego Bay within the contemplation of the requirements of the doctrine. We believe they were.

Montego Bay is a closely-held corporation in which Vinton Salkey, his mother, and his sister owned 100% of all of the outstanding stock of the entity at all relevant times herein, and wherein the Salkeys guaranteed a payment of a loan made to the corporation by the SBA. In substance, Mr. and Mrs. Salkey guaranteed performance of the loan contract by Montego Bay by agreeing to repay the loan to the SBA, as if they were primarily liable, if the corporation could not. A person in "privy" with another is one "who is a partaker or has any part or interest in any action, matter, or thing." *Black's Law Dictionary* 1362 (4th ed. 1968). Clearly, the Salkeys had a substantial interest in the *Montego Bay I* 1985 action since full payment to the SBA by Montego Bay would have extinguished all or part of their *guaranteed* obligation to the SBA. Therefore, even though the Salkeys did not join as party plaintiffs in the suit in 1985, they were nevertheless in privity with Montego Bay by virtue of their guarantor status and stock ownership therein. Moreover, upon the transfer of said case by Judge Margolis to the U.S. District Court for the Southern District of Florida, they did in fact join in said action as party plaintiffs in 1987. We also find creditable support for our conclu-

---

**10.** Section 1491(a)(1) specifically states that—
The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages not sounding in tort.

sion that privity exists as a result of the Salkeys' stock ownership in Montego Bay, as expressed in *Sparks Nugget Inc. v. C.I.R.,* 458 F.2d 631 (9th Cir.1972), which held that:

It would seem that the public policy underlying the doctrine of *res judicata,* as a bar to repetitious litigation, would support a finding of privity between a close corporation and its sole or controlling shareholder.

For example, in the case at bar, given the Joint Response To Court's Order of February 26, 1992, the parties reported that:

(i) there were only two stockholders initially in Montego Bay at its incorporation in 1977, *i.e.,* Lena Brown (Mr. Salkey's mother) and Leonie Tong (Mr. Salkey's sister), each owning 50%; and

(ii) in May 1981 that ownership changed to 50% in Lena Brown, 33⅓% in Leonie Tong, and 16⅔% in petitioner Vinton Salkey. Defendant's counsel reported therein that he was in possession of statements dated January 26, 1980, signed by the foregoing three persons, representing that the percentages of stock ownership on that date were "Brown 10%, Tong 10% and Salkey 80%." Said documents were Statements of Personal History of the shareholders in Montego Bay that were submitted to the SBA in connection with the $150,000 loan made in April 1981, *supra.* These personal history statements corroborate the representations in the loan application regarding the foregoing stock ownership in Montego Bay.

In view of the foregoing discrepancies in the stock ownership in Montego Bay during all relevant times herein, a hearing was held in open court on March 26, 1992, at which both Mr. and Mrs. Salkey were present and testified. The record of said hearing established, *inter alia,* that the aggregate number of shares authorized through the by-laws is 500, Defendant's Exh. 9 at 2, and Vinton Salkey testified that only 300 were issued—50 to him (16.-7%), 150 to his mother (50%), and 100 to his sister (33.3%). However, as previously noted, when Vinton Salkey applied for the SBA loan, he stated that he owned 80% of the business. At the hearing on March 26, 1992, when Vinton Salkey was questioned by the court as to this discrepancy, the following dialogue occurred:

Court: "When did you and your wife start Montego Bay business?"

\*　　\*　　\*　　\*　　\*　　\*

V. Salkey: "[in the beginning] of 1977."

\*　　\*　　\*　　\*　　\*　　\*

Court: "And then in March of '77 you incorporated....?"

V. Salkey: "Yes, sir."

Court: "... And you put up all the money or you and your wife?"

V. Salkey: "My wife and I."

Court: "Put up all of the money?"

V. Salkey: "Everything, Sir."

Court: "All right. And did there come a point in time when anybody else put up any money in that business?"

V. Salkey: "When—when the shares—when the president of the—when we decided to incorporate, my mother and my sister was asked to put something in."

\*　　\*　　\*　　\*　　\*　　\*

Court: "Did they put anything in?"

V. Salkey: "Yes, sir, they did."

Court: "And how much did your mother put in?"

V. Salkey: "I think $1000—I think it was $1000."

Court: "And how much did your sister put in?"

\*　　\*　　\*　　\*　　\*　　\*

V. Salkey: "I would say about $500. [or somewhere between $100 and $500]."

\*　　\*　　\*　　\*　　\*　　\*

Court: "Okay. And how much did you put in? And your wife?"

\*　　\*　　\*　　\*　　\*　　\*

V. Salkey: "To start that store, we put in—we must have put $20,000, $25,000 inside there."

Court: "You and your wife?"

V. Salkey: "Yes."

\*　　\*　　\*　　\*　　\*　　\*

Court: "And did there come a point in time thereafter that you and your wife put in additional funds?"

V. Salkey: "Oh, yes."

Court: "How much, sir?"

V. Salkey: "We put around $15,000."

\* \* \* \* \* \*

V. Salkey: "Another $15,000 to $20,000 was put in there."

Court: "Okay. So prior to the time you sold the store, you would estimate that you and your wife put in an aggregate of what, sir, into the business?"

\* \* \* \* \* \*

V. Salkey: "Around $65,000, $70,000."

Court: "And that is the business that was subsequently incorporated?"

V. Salkey: "Yes, sir. Oh, yes."

Transcript of March 26, 1992 hearing, pp. 165–71.

In light of the fact that the Salkeys contributed up to $70,000 to the business and capital of Montego Bay and two other individuals contributed no more than $2,000, it is clear beyond cavil that the controlling shareholders in Montego Bay were in fact the Salkeys, even though the issued stock certificates represented Vinton Salkey as owning only 16.7%. In fact, Vinton Salkey did not understand or intend the issuance of shares to his mother and sister to reflect ownership in the corporation, but rather believed it was a debt obligation in that he was required to pay them back.[11] In that connection, Mr. Salkey responded to the following questions posed by defendant's counsel:

Mr. Melnick: "Okay. At that time, did you understand that the issuance of the shares reflected ownership in the corporation?"

V. Salkey: "No."

\* \* \* \* \* \*

Mr. Melnick: "What did you understand the shares to represent? What did you understand them to mean? To indicate?"

V. Salkey: "That when the business made money, I would pay them back the $1000 that they put in."

Mr. Melnick: "You believed that the shares meant that you had to pay them back?"

V. Salkey: "I think it was a loan to me and I would pay them back the money whenever I could."

\* \* \* \* \* \*

Mr. Melnick: "In your mind they didn't have any interest?"

V. Salkey: "No."

Mr. Melnick: "You had complete interest in the corporation?"

V. Salkey: "Right. Right."

\* \* \* \* \* \*

Mr. Melnick: "You believed you had 80 percent ownership?"

V. Salkey: "Yes, sir."

*Id.* at 171–73, 176, 180.

Mr. Salkey then responded to the following questions by the court:

Court: "No one else made any financial contribution to the business of Montego Bay Imports except your sister—?"

V. Salkey: "Yes, sir."

Court: —"and your mother?"

V. Salkey: "That's right, sir."

*Id.* at 188.

Therefore, in light of the foregoing admitted facts and the pronouncement in *Sparks Nugget*, it is clear that the Salkeys were the controlling shareholders/owners of Montego Bay. *Id.* at 189. Accordingly, we find on these facts that privity existed between the Salkeys and Montego Bay in connection with the prior complaint ($ 414–85C) in this court, which supports an indispensable element in defendant's *res judicata* contention.

b. *Underlying Transactions
of the Claim*

As noted *supra, res judicata* prevents a plaintiff from asserting the same transactional facts under a different cause of action. A determination of such facts, of

---

**11.** In fact, Mr. Salkey testified in substance that his mother and sister were shown as the shareholders of Montego Bay because he could not obtain a liquor license inasmuch as he was not then a United States citizen. *Id.* at 171–72.

course, requires a thorough examination of " 'whether the facts are related in time, space, origin, or motivation, and whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.' " *Bass*, 11 Cl.Ct. at 299, *citing Nevada*, 463 U.S. at 131 n. 12, 103 S.Ct. at 2919 n. 12, *quoting* Restatement (Second) of Judgments § 24 (1983). Plaintiffs argue that new circumstances exist that were not proffered in *Montego Bay I.* Specifically, plaintiffs contend that following the sinking of the vessel on April 17, 1985, no additional payments on the note were made until *after* notice by the SBA on July 2, 1985, that the loan was in default status. Moreover, plaintiffs emphasize that the original action was filed in the Claims Court on July 16, 1985, which was before any of the $96,000 was paid by mistake, unjust enrichment, or by illegal exaction.

However, plaintiffs fail to acknowledge that *the* transaction underlying the 1990 claim, specifically the destruction of the CHANTAL S, is exactly the same factual transaction that underlaid the 1985 claim in this court. Since the plaintiffs' complaint allegedly for $96,000 in mistaken payments and $95,000 for the equity loss of the CHANTAL S, on a breach of contract theory, both turn on the fate of the government's actions toward the vessel itself, the claims most certainly stem from the same transaction, to wit, the sinking of the CHANTAL S, and we so find.

#### c. *Opportunity to Bring Claims Previously*

It must now be determined whether new allegations which plaintiffs allege, posturing a "fresh" theory for relief, could and/or should have been raised in *Montego Bay I* in 1985. In this connection, plaintiffs assert that, with respect to the $96,000 claim for mistaken payments, no payments were made after the sinking of the CHANTAL S and *prior* to the time the initial action was filed in this court on July 16, 1985. In short, plaintiffs state that "[t]hey had not made any of the 48 contested payments [48 × $2,000 = $96,000] until after notice by the SBA, on July 2, 1985, that the loan was in default. The prior action was filed on July 16, 1985, before any of the $96,000 was paid."

Plaintiffs' effort to skew the facts will give them no comfort for two reasons. First, plaintiffs are in error in contending that—no part of the $96,000, allegedly paid by mistake after the sinking of the CHANTAL S on April 17, 1985, was paid *prior* to the filing of the complaint on July 16, 1985. The SBA's Transcript of Account, duly certified, discloses that after April 17, 1985 (*i.e.*, the date of the sinking of the CHANTAL S), and before July 16, 1985, (*i.e.*, the date the complaint was filed), the following payments were recorded *as made* on behalf of Montego Bay regarding the loan:

| Date | Remittance | Principal | Interest | Principal |
|---|---|---|---|---|
| 051385 | $2,000 | — | $2,000.00 | $137,398.88 |
| 060185 | $2,000 | $682.29 | $1,317.71 | $136,716.59 |
| 070985 | $2,000 | $683.40 | $1,316.60 | $136,033.19. |

Thus, it is indisputable that sufficient alleged "mistaken" payments had been made *prior* to the filing of the complaint (# 414–85C) on July 16, 1985, to enable plaintiffs to have raised that issue therein. Even if none of these so-called mistaken payments was made until *after* said July 16, 1985 complaint was filed in this court (*Montego Bay I*), plaintiffs could have, nevertheless, amended their complaint to include this issue inasmuch as 15 payments were made between July 16, 1985, and prior to the date the Claims Court dismissed and transferred that case to the district court on September 29, 1986, 10 Cl.Ct. 806. The Rules of the United States Claims Court contain liberal pleading requirements. It cannot be disputed, therefore, that the Salkeys knew of

the pleadable action since they were intimately involved with Montego Bay's business affairs. In light of all of the foregoing circumstances, plaintiffs' bare bones allegation of mistaken payments appears to be "mere verbiage, 'made solely for the purpose of obtaining jurisdiction.'" *Equitable Trust Co. v. Commodity Futures Trading Comm'n,* 669 F.2d 269, 273 (5th Cir.1982), *citing Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

The same analysis applies even more fervently to the $95,000 claim for breach of contract. Clearly this allegation was also available to plaintiffs in their *Montego Bay I* July 16, 1985 complaint, or by amendment thereto thereafter since they *then* knew that—the value of the CHANTAL S was $215,000; the balance due on the note was approximately $120,000; and the alleged resulting loss was $95,000.

Although it may appear, at first blush, to be unfair to plaintiffs to dismiss this suit without reaching the substantive merits, we believe it would be even more unfair to the defendant to require it to defend itself once again, *i.e.,* for the *third time,* in view of plaintiffs' pleading deficiencies. A fundamental purpose of the doctrine of *res judicata* is that of generating a state of repose for litigants in that it protects a victorious party from being dragged into court time and time again by the same opponent on the same cause of action. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); 1B Moore's ¶ 0.405[1] at 186. We therefore hold on the facts here that *res judicata* bars plaintiffs from maintaining the suit at bar.

3. *Issue Preclusion*

■ As noted previously, *res judicata,* or claim preclusion, operates between parties simply by virtue of a final judgment, whereas issue preclusion, or collateral estoppel, applies only to issues actually litigated. *Bass,* 11 Cl.Ct. at 298. Here, with respect to issue preclusion, defendant argues that, even though plaintiffs are now alleging that the "collateral ... [was] destroy[ed] in a commercially unreasonable manner," and mistaken payments were made, at the center of these bland claims is the continued alleged unlawful destruction of the CHANTAL S. In examining the quoted phrase, we find that the word "destroying" is the action verb delineating the tortious conduct and the balance of the phrase "in a commercially unreasonable manner" simply explicates *how* that act was committed. Thus, and in essence, we hold that the destruction of the collateral (the CHANTAL S) clearly sounds in tort as stated in the original Claims Court opinion; consequently, defendant argues that plaintiffs are also barred "from raising again the issue of whether the claim sounds in tort or contract by the doctrine of issue preclusion." DMD at 14.

The difference between claim preclusion and collateral estoppel can be explained as follows:

The related doctrines of res judicata and collateral estoppel embody the concept that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction * * * cannot be disputed in a subsequent suit between the same parties or their privies." Res judicata applies to repetitious suits involving the same cause of action. It binds the parties and their privies "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *However, collateral estoppel is more limited in the scope of issues affected; less limited in the scope of bar applied. Collateral estoppel is appropriate when, upon a different cause of action between identical parties, a party attempts in the later case to contest an issue which was actually contested between the parties in a prior action and "upon the determination of which the finding or verdict was rendered."*

*McMullan v. United States,* 686 F.2d 915, 231 Ct.Cl. 378, 381 (1982) (emphasis added; footnotes omitted), and *Nevada v. United States,* 463 U.S. 110, 130 n. 11, 103 S.Ct. 2906, 2918 n. 11, 77 L.Ed.2d 509 (1983). In a similar framework to that outlined previ-

ously with respect to *res judicata,* when applying the doctrine of collateral estoppel, three factors must be addressed. First, it must be determined whether the issues in the present action are actually the same as those addressed in the 1985 claim. Secondly, a determination must be made as to whether the facts and legal principles which led to this court's previous holding have changed in any way. Thirdly, a finding must be made as to the existence of special circumstances present in *this* case which would justify not applying the doctrine. *McMullan,* 686 F.2d 915, 231 Ct.Cl. at 382.

### a. *Similarity of Issues*

With respect to this part of the test, the question remains—whether the new causes of action asserted by plaintiffs in this suit to establish jurisdiction, stripped to the least common denominator, are actually the same contested issues as in the 1985 claim, in all material particulars, which this court held sounded in tort. We believe they are. The issues raised by plaintiffs here are, in essence, the same as those litigated in 1985 since the central claim for relief in *both* complaints is the *destruction* of the CHANTAL S by the United States Government. Therefore, the abortive attempt to recharacterize their claim from tort to contract is meaningless since the central or operative issue is the same—namely, the tortious action of the USCG. Plaintiffs argue that their new contention that the collateral was destroyed in a "commercially unreasonable manner" is not the equivalent of their previous claim of "unlawful" destruction. This hospitable argument does not persuade this court inasmuch as we are constrained to hold that if it—'walks, talks, and quacks like a tort, it is, as a matter of law, a tort.' This court held in *Montego Bay I* that the initial claim sounded in tort with respect to the government's conduct. Plaintiffs again are addressing the propriety of the government's conduct with respect to the act of destroying the CHANTAL S. Simply because in the first claim the plaintiffs embrace the word "unlawful" as the operative adjective and in the second the adjective "unreasonable" does not de-

tract from the central issue—whether the government acted tortiously in the circumstances of the case. Therefore, we find that the underlying issue in both claims is the same in all material particulars.

### b. *Same Facts and Legal Principles*

As to the second factor, it is also clear that the facts and legal principles which led to the holding in 1986 have not changed. That is to say, plaintiffs are asserting the same facts as in the 1985 claim. Moreover, the plaintiffs do not argue any change in statutory or case law which would affect this aspect of the test. Therefore, it is indisputable that the jurisdictional basis of this court under the Tucker Act has not been modified in any way. Plaintiffs, therefore, cannot defeat collateral estoppel by their argument regarding this element.

### c. *Special Circumstances*

With respect to the third and final factor, we find no special circumstances that would justify our failure to apply the doctrine of issue preclusion. Moreover, plaintiffs have failed to proffer any such creditable circumstances. We hold, therefore, that plaintiffs are collaterally estopped from filing the subject claim in this court.

### 4. *Is There An Actionable Contract Claim?*

 Even assuming arguendo that the doctrines of *res judicata* and collateral estoppel do not bar plaintiffs from bringing subject claim, we believe that the defendant is correct, nevertheless, in asserting that there is no contract which would give this court subject matter jurisdiction to entertain *this* claim. As previously observed, the government's central argument asserts that the primary note, guarantees on the note, deed of trust and first preferred ship mortgage were issued by plaintiff(s) *only as security* for the loan, *and are not contracts by the government to pay money to plaintiffs in the event the collateral "is destroyed by a governmental entity."* DMD at 19. Moreover, the government contends that even if there was an implied warranty, it would not extend to the actions of another government agency. *Id.* n. 9, *citing to Glasgow Assocs. v. United*

*States,* 495 F.2d 765, 770, 203 Ct.Cl. 532 (1974).

The Tucker Act, 28 U.S.C. § 1491(a)(1), specifically confers jurisdiction on the Claims Court based "upon any express or implied contract with the United States." However, a mere allegation by the plaintiffs that a contract exists is not, *ipso facto,* enough to overcome a motion to dismiss for lack of subject matter jurisdiction where under no conceivable hypothesis, on the facts here, plaintiffs can recover.[12] Here, plaintiffs assert that for "the purpose of a motion to dismiss, all well plead allegations of the complaint ... must be taken as true." Pltfs' Opposition at 7. This is not the total test. Rather, pursuant to RUSCC 12, "we *normally* consider the facts alleged in the complaint to be true and correct." *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d at 747 (emphasis added). Therefore, the simple act of alleging *a contract* which does not require the defendant to compensate plaintiffs for the destruction of the CHANTAL S will not avoid a motion to dismiss for lack of subject matter jurisdiction. It is well settled that the burden is on the plaintiffs to establish subject matter jurisdiction by a preponderance of the evidence. We believe the plaintiffs have not met their burden with respect to their so-called contract allegations at bar inasmuch as there are "no facts that show or suggest in some manner an agreement between the parties, a meeting of the minds and a mutual consent to be bound" to the extent they would be contractually entitled to relief on the grounds pled. Consequently—

> There are no facts alleged that would evidence a promise, representation or statement by any authorized government official that plaintiff's boat would be damage-free or carefully handled during the ... period [it was pled as collateral to a SBA secured loan].

12. In this connection, we observe consistent with *Hamlet v. United States,* 873 F.2d at 1416, that—"[t]he complaint should not be dismissed unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46 [78 S.Ct. 99, 101–102, 2 L.Ed.2d 80] ... (1957)."

*Shaw v. United States,* 8 Cl.Ct. 796, 799 (1985).

#### a. *Unjust Enrichment*

█ With respect to the general allegations stated in the complaint by plaintiffs, that defendant was unjustly enriched under both the $96,000 claim and the $95,000 claim, we believe that, inasmuch as money paid by mistake is within the parameters of the doctrine of unjust enrichment, these issues may be considered together. It is a well-established legal principle that "the doctrine of unjust enrichment ... is not contractual but [rather is] equitable in nature." *See Black's Law Dictionary* at 1705, *citing State v. Martin,* 59 Ariz. 438, 447, 130 P.2d 48, 52. Because plaintiffs' foregoing allegations are not in contract, these claims are not within this court's jurisdiction. *See id.* ("one who has conferred a benefit upon another solely because of a basic *mistake* of fact ... is entitled to restitution [under the doctrine of unjust enrichment] ) (emphasis added). In *Aetna Casualty & Sur. Co. v. United States,* 655 F.2d 1047, 228 Ct.Cl. 146, 164 (1981), the court there stated that—"[p]laintiffs' unjust enrichment/equitable ... theory of recovery is therefore based upon a contract implied in law, over which this court has not been given jurisdiction."

#### b. *Promissory Note*

In their complaint, plaintiffs plead that the promissory note represents a contract with the United States. This is unquestionably true. However, plaintiffs make absolutely no showing that the operative provisions of the note grant them the right to sue defendant regarding the claims raised at bar.

This is so because the promissory note specifically states that the *holder* (i.e., SBA) has no duty "to administer, supervise, preserve, and protect the [c]ollateral." DMD, Appendix at 9.[13] Moreover, provi-

13. "The undersigned [maker] agrees to take all necessary steps to administer, supervise, preserve, and protect the Collateral, *and regardless of any action taken by Holder [SBA/USA], there*

sions in the note to the effect that the Salkeys would have rights against the SBA if "deterioration, waste, or loss [of the collateral was] caused by a willful act or willful failure to act of the Lender [SBA]" applies only to the acts of the SBA and *not* the USCG. A literal reading of the quoted provisions belies any obligation of the SBA for the acts of an *unrelated* governmental agency. "It is established beyond dispute that one Government agency is without power to bind another to refrain from performing a sovereign act."[14] Here, the United States District Court for the Southern District of Florida, affirmed by the United States Court of Appeals for the Eleventh Circuit, held that the destruction of the CHANTAL S fell within the implied discretionary function exception of the SAA and the PVA. As a consequence, we hold that plaintiffs have no contract claim for the destruction of the CHANTAL S in a "commercially unreasonable manner" based on the promissory note.

### c. *Deed of Trust*

The Deed of Trust, executed by the Salkeys and the SBA, contains similar language to that found in the promissory note. Specifically, the Deed of Trust provides for liability to plaintiffs if there is any "deterioration, waste, or loss" of the collateral caused by the "willful act or willful failure to act of lender." DMD, Appendix at 22–25. Given the foregoing, the same principles outlined previously as to the promissory note are equally applicable to the Deed of Trust; therefore, we hold that plaintiffs have no contract claim with respect thereto.

### d. *First Preferred Ship Mortgage*

■ The SBA was also secured by a first preferred mortgage on the CHANTAL S. A preferred mortgage is a "lien on the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by the vessel." 46 U.S.C. § 31325(a). The first preferred mortgage on the CHANTAL S contains no language such as that found in the deed of trust or promissory note, *supra*. By contrast, the only limitation upon a mortgagee's (the SBA) interest in a vessel under a first preferred ship mortgage is governed by 46 U.S.C. § 31327, which provides that:

> The interest of a mortgagee in a documented vessel or a vessel covered by a preferred mortgage ... may be terminated by a forfeiture of the vessel for a violation of a law of the United States only if the mortgagee authorized, consented, or conspired to do the act, failure, or omission that is the basis of the violation.

The language of this particular statute clearly fails to grant plaintiffs any cause of action with respect to a contractual claim against the SBA in this court. Plaintiffs failed to allege any additional evidence that would suggest the SBA acted in a manner consistent with the violations outlined in the statute.[15] Therefore, it is also clear that the preferred mortgage affords plaintiffs no basis for asserting jurisdiction in this court for the destruction of said boat.

### e. *Other Documents Or Evidence*

■ In addition to the promissory note, guarantees, deed of trust and preferred mortgage, there is no other document or evidence that would establish an express or implied-in-fact contract sufficient to provide plaintiffs with a cause of action against the defendant in the Claims Court. It is inconceivable, on the facts here, that the SBA would have agreed, expressly or impliedly, that the USCG, the Department of Defense, or any other government agency, regardless of the national need, should or must refrain from carrying out its pre-

---

*shall be no duty upon holder in this respect."* (Emphasis added.)

**14.** Thus, it is a well-established principle that: [T]he United States when sued as a contractor can not be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.

*cf. Glasgow Assocs. v. United States*, 495 F.2d at 770, *citing Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 345, 69 L.Ed. 736 (1925).

**15.** Had it done so, we believe such circumstance would implicate 15 U.S.C. § 634(b)(1) fixing jurisdiction in the United States District Court, *supra*.

scribed statutory or regulatory function merely because of an unrelated contractual obligation with another agency. We do not understand that a contracting officer has such power or authority to circumscribe the exercise of such governmental power. In *Miller v. United States*, 161 Ct.Cl. 455, 472 (1963), the court noted that where the act by the government (prohibition of drug trafficking) is not directed specifically at plaintiffs' contract performance nor applicable to it, but is rather a "public and general" act for the "general good" issued in the exercise of the sovereign power, there is no contract liability. This reasoning is clearly applicable to the actions of the USCG at bar.

Finally, it should be noted that plaintiffs call for reformation or rescission of the promissory note. Since we hold that there is no jurisdiction for a contract claim, these claims are, therefore, moot.

### 5. *Plaintiffs' Claims Sound in Tort.*

 Plaintiffs assert two essential claims. The first is that plaintiffs mistakenly made $96,000 in payments on their promissory note, or that the defendant was unjustly enriched, or that the SBA illegally exacted payments under the note. The second claim is one for $95,000 for the excess amounts realized by defendant, or for unjust enrichment through the seizure of the CHANTAL S. These claims proffered by the plaintiffs were somewhat vexing to analyze with respect to their legal significance. However, after careful consideration of plaintiffs' complaint and opposition to defendant's motion to dismiss, we firmly believe that the essence of all of these claims sound in tort and therefore do not fall within our Tucker Act jurisdiction. Therefore, even assuming that the aforementioned impediments do not apply, the fundamental basis of plaintiffs' claims bars this court from finding jurisdiction.

The $96,000 claim clearly sounds in tort. The essence of the claim is that the SBA wrongfully or illegally compelled the plaintiffs to continue to make payments on the promissory note following the destruction of the vessel. This claim appears to fall within the common law principle of misrep-

resentation or inducement which are clearly tortious in nature. *Somali Dev. Bank v. United States*, 508 F.2d 817, 205 Ct.Cl. 741, 749 (1974) ("negligent misrepresentation, wrongful inducement ... are claims sounding in tort"); *United States v. Neustadt*, 366 U.S. 696, 703–04, 81 S.Ct. 1294, 1298–99, 6 L.Ed.2d 614 (1961) (the term "misrepresentation" includes "negligent misrepresentation").

The second claim, as noted, is one in unjust enrichment. This is neither a contract nor a tort claim. Because it is an equitable doctrine and not a contractual doctrine, it cannot be entertained in this court for reasons expressed *supra*.

The defendant is also correct in that plaintiffs' second claim can be characterized as a conversion, which also is a tort. W. Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser and Keeton on Torts § 15 (5th ed. 1984). Conversion in this case may rest on two grounds, acquiring possession or destruction. Plaintiffs' $95,000 claim contains the word "seizure," thus asserting that defendant wrongfully acquired possession of the CHANTAL S. Such a claim is clearly one in conversion. *Id.* at 93 (one who acquires wrongful possession without legal justification has converted the chattel). If plaintiffs' claim is for the destruction of the CHANTAL S, this would constitute a conversion. *Id.* at 100 (intent to destroy chattel of the plaintiffs is "obviously a complete interference with plaintiffs' rights, and an obvious conversion"). Therefore, it is clear that plaintiffs' recharacterization continues to sound in tort—we so hold—and therefore this court must again dismiss for lack of subject matter jurisdiction.

### *Conclusion*

For all of the foregoing reasons, defendant's motion to dismiss is hereby GRANTED. The Clerk shall enter judgment accordingly, with costs to the defendant against plaintiffs.

IT IS SO ORDERED.